1
2
3
4
5
6                 **UNITED STATES DISTRICT COURT**
7                        **DISTRICT OF NEVADA**
8
9   BARBARA A. PINKSTON,

         *Petitioner*,                           2:07-cv-01305-KJD-LRL
10
     vs.                                          ORDER
11
12  SHERYL FOSTER, *et al.*,

13          *Respondents.*

14
15       This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on

16  the remaining claims.  The Court reaches only Ground 3 of the amended petition.

17                              ***Background***

18       Petitioner Barbara Pinkston seeks to set aside her 1997 Nevada state conviction,

19  pursuant to a jury verdict, of first degree murder with the use of a deadly weapon.

20       Pinkston was convicted of the murder of Greg Payne on Father's Day, June 18, 1995.

21  It was undisputed that Pinkston shot Payne twice with a .380 caliber semiautomatic handgun

22  as he was walking toward his truck.  The dispute at trial focused upon the circumstances

23  leading up to the shooting, Pinkston's state of mind, and her defense that she was a domestic

24  violence victim and reasonably believed that Payne intended to kill her.[1]

25  _____

26       [1]See,e.g., #17, Ex. 33, at 23-24, 31-33, 41-42 & 47 (defense opening statement).  The following
    summary in the text is intended only as an overview of the basic factual particulars of the case in order to
27  provide context for the discussion of the issues.  Any absence of mention of specific evidence in this overview
    does not signify that the Court has overlooked or ignored that evidence in considering a particular issue.
28                                                                      (continued...)

1  Pinkston met Payne initially when he responded to her ad in October 1992 looking for
2  a roommate to help with the rent on her house.  The roommate relationship began as a
3  platonic one, but Pinkston and Payne became romantically involved in November 1992.  The
4  romantic relationship was a rocky one, however, basically from its inception.  The relationship
5  also produced a daughter even as it initially unraveled.  In addition to producing a child, the
6  relationship lead to a number of judicial proceedings concerning, *inter alia*, protection orders
7  and child visitation.[2]

8  A court hearing was scheduled for Monday, June 19, 1995, to address custody and
9  visitation of their daughter.[3]

_____

[1](...continued)

The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court.  The Court summarizes same solely as background to the issues presented in this case.  No statement of fact made in describing statements, testimony or other evidence in the state court, whether in this overview or in the discussion of a particular issue, constitutes a finding by this Court.

[2]See,e.g., #18, Ex. 40, at 49-78 (Pinkston's trial testimony providing her account of  the early part of the relationship).  While the term "roommate" commonly used in this context also was used at trial, the lodger in this instance was to reside in another part of the house rather than the same room.  Pinkston would have been approximately 40 years old in 1992.  See #18, Ex. 40, at 39-40.

Much of the trial evidence pertained to the multiple domestic judicial proceedings and the charges and counter-charges made by both sides therein, as it bore upon the contested issue of Pinkston's state of mind at the time that she shot Payne.  The evidence, in a sense, echoed the "he-said, she-said" disputes from the domestic judicial proceedings, with Payne of course no longer being alive to speak for himself.  The State sought to portray Pinkston as an obsessed, controlling, and manipulative figure reminiscent of the Glenn Close character in the movie "Fatal Attraction" who lied to the courts and others in an effort to get what she wanted, as to which she herself often was conflicted in her own mind.  The defense sought to portray Pinkston instead as the victim of a physically and verbally abusive Payne who posed a threat of death or serious physical harm to Pinkston, their daughter, and her mother and also, allegedly, presented a threat of sexual abuse to their daughter.

The Court does not seek to diminish the significance of such evidence in the brief summary set forth herein.  The Court has not extensively catalogued the back and forth of the domestic dispute evidence because the bottom line remains that the jury was presented with two dramatically different pictures of the circumstances that preceded the shooting as they related to Pinkston's state of mind at the time.  The critical point, as discussed herein, is that – under the jury instructions given and the arguments made to the jury – the jury could believe Pinkston's explanation of the evidence that the State relied upon to establish that she preplanned the killing and still potentially find her guilty of first-degree murder.

[3]E.g., #17, Ex. 35, at 272-74.

In personal journal entries in early June 1995, Pinkston discussed her frustration with the court proceedings and her belief that the presiding judge in the upcoming June 19, 1995, hearing had turned against her.[4]  In an undated document prepared at some point after May 25, 1995 and before June 18, 1995, Pinkston outlined possible options as follows:

> Option No. 1 is to do nothing, to let the courts place us in danger and have Kaitlyn scarred emotionally and probably physically abused, to willingly give her to someone who does not have her best interests at heart and who is now using her as a vehicle to further continue this very sick relationship.
>
> Option No. 2 is to run away, to go underground, but if I'm located I will be sent to prison for child stealing, and Greg will be given Kaitlyn permanently.
>
> No. 3 is to commit suicide, but Kaitlyn will be given to Greg permanently.
>
> And Option No. 4 is to kill Greg.

#17, Ex. 35, at 163-64, 221-24 & 230-31.

Pinkston maintained at trial -- through her own testimony and in part through that of a nursing student counselor that she saw at the time – that this "options memo" was merely a self-counseling "problem solving exercise" where all alternatives, no matter how unrealistic, were written down.  Pinkston had a bachelors in sociology, and at the time she was in a masters program for sociology at UNLV.  She testified that she had been writing personal journals every year of her life since she was thirteen years old.  Pinkston maintained that the option stated as to killing Payne did not reflect something that she actually intended to do and that each one of the options discussed was "absolutely impossible."[5]

At some point after 12:30 p.m. on the afternoon of the shooting, Pinkston went to a notarial service and had a guardianship document notarized.  The document stated that it was Pinkston's desire to have her daughter remain in the custody and care of Pinkston's mother

---

[4] See,e.g., #18, Ex. 44, at 154 (State's recital of journal entries in closing argument).

[5] #18, Ex. 38, at 7-11 & 14-16 (Consuella Freeman); *id.*, Ex. 40, at 39-40 & 167-73 (Pinkston); *id.*, Ex. 41, at 4-6 (same).

1   in the event of Pinkston's death "or under any unfortunate circumstance which would prevent

2   me from taking care of" her daughter itself.[6]

3        Pinkston maintained at trial that she had the guardianship document notarized because

4   she was afraid that Payne was about to kill her, following an alleged threat by Payne on the

5   Friday night before Father's Day.  She testified that she planned to file the guardianship

6   document at the court proceeding the next day on Monday.  According to Pinkston, she

7   stopped at a copy store and made copies of the notarized document, returned home and put

8   one copy in her notebook, and then put the original and three copies in an envelope in

9   preparation for filing the document the next day while at court.[7]

10       On the afternoon of the shooting, Pinkston showed up at a facility called the Discovery

11  Zone where Payne was having a supervised visitation of their then nineteen-month old

12  daughter with Pinkston's mother present.  Pinkston herself was not supposed to be present.

13       Thomas Page testified as follows in regard to what he observed while taking two

14  cigarette breaks outside the Discovery Zone.  He saw Pinkston initially approach on foot from

15  what he perceived to be the direction of the parking lot for a neighboring business, Mountasia.

16  About 30 to 45 minutes later, he heard and saw Pinkston and Payne arguing outside the

17  facility.  While he was not trying to listen to their heated conversation, and heard only "bits and

18  pieces," he heard references to protective orders and the fact that neither was supposed to

19  be near the other.  Page did not hear Payne make any threats toward Pinkston.  Page did not

20  see Payne make any combative or assaultive physical gestures toward her.  Page, again, did

21  not hear every exchange between the two.[8]

22       Jack Wilkins walked out to and from his vehicle briefly during the time that Pinkston

23  and Payne were arguing.  Wilkins observed Pinkston standing over Payne who was sitting on

24  the curb with his head down, fidgeting with grass or gravel on the ground.  Wilkins perceived

25  _____

26       [6]FN #17, Ex. 35, at 45-67 (notary); *id.*, at 157-60 (detective).

27       [7]#18, Ex. 40, at 173-75, 182 & 183-88 (Pinkston).

28       [8]#17, Ex. 33, at 50-60, 70-71, 81-87 & 90-92; cf. *id.*, at 91 ("I was not trying to hear it.").

Pinkston to be acting aggressively and that Payne was not.  Wilkins heard Payne say at one point: "That's why your father blew his f—ing head off."  Pinkston responded: "Come on, you know," with the intonation of "Give me a break."  Wilkins did not hear the specifics of any other part of the argument during the brief interval that he was within earshot.[9]

Eventually, Thomas Page heard Payne state to Pinkston "something to the effect of, 'I'm out of here. I'm leaving.  You shouldn't be here.'"  Payne walked toward his truck, and Page testified that it "appeared the he was putting his keys in his truck to leave."[10]

Pinkston testified that she thought Payne was going to his truck for a gun that she maintained that he kept under the seat.  According to Pinkston, Payne kept trying during their discussion that day to get her to meet with him at a park in a remote area that she had been to the day before with her mother and daughter.  Pinkston testified that Payne said to her immediately before walking toward the truck for her to "stand right there," that she was dead, and that he was going "to blow [her] f___ing head off."  She testified that she believed that he was going to follow through on multiple threats allegedly made to her starting in late October 1994.[11]

Thomas Page saw Pinkston walk quickly up to about six to eight feet behind Payne, pull a gun, assume a stance with her feet shoulder width apart, and fire.  Payne dropped or

[9]#17, Ex. 33, at 151-81.

[10]#17, Ex. 33, at 60-62.

[11]See #18, Ex. 40, at 205-24 (day of incident); *id.*, at 134-45, 160-62 & 173 (detailing prior alleged threats).

A Pinkston coworker, Robert Schmidt, testified for the defense that Payne said to him on the phone in late December 1994, when Schmidt was being evasive as to Pinkston's whereabouts or availability: "Well, you just tell her next time you see her, she can run but she can't hide." #17, Ex. 37, at 106-07.

A Pinkston neighbor, Mary Marineau, testified for the defense that she observed an incident shortly before Christmas Eve, 1994, where a man arguing with Pinkston shouted at Pinkston in the driveway of her residence: "You can't run far enough, bitch," and "You're dead meat, and so is that brat of yours."  According to Marineau, Pinkston drove away and the man went to his pickup truck, retrieved a handgun, and then tried to drive after Pinkston while handling the steering wheel with the gun in hand.  Marineau identified Payne at trial as the man that she saw from a photograph presented to her by defense counsel.  Marineau testified that she did not report the incident to the police at the time because she did not get a license number.  #18, Ex. 38, at 86-100.

1  collapsed "like a sack of potatoes" after the shot.  Page ran inside the Discovery Zone to tell

2  someone to call 911 after the shot.[12]

3  At one point after Thomas Page came back outside, he made eye contact with

4  Pinkston, who was walking away, at which point she accelerated her pace back toward the

5  neighboring business, Mountasia.[13]

6  John Egbert testified as follows.  He was working at Mountasia disposing of waste in

7  the dumpster enclosure in the rear.  He heard a loud noise like a gunshot or a tire blowout.

8  He stepped outside the enclosure, looked around, and then returned inside to continue his

9  task.  About ten seconds after the first noise, he heard a second noise, with it being more

10  clear that the two noises sounded like gunshots.  About twenty seconds later, he stepped out

11  of the enclosure again and observed a woman moving at a jog from the Discovery Zone

12  toward the front of Mountasia.[14]

13  Pinkston testified that as Payne walked toward his truck she was terrified.  According

14  to Pinkston, there was a very loud noise in her ears, and she felt "like pushing on my face."

15  She testified that she got the gun out of her purse but that she did not mean to pull the trigger.

16  According to Pinkston, after the first shot, Payne "just stood there" and turned away from the

17  truck door, and she thought that the shot had missed.  She testified that she heard the second

18  shot but did not remember when she fired it.[15]

19  The apparent first shot hit Payne in the right back.  The bullet traveled through his right

20  lung, passed through the aorta, traveled through his right lung, and then exited his left chest

21  before penetrating the driver's side window of his truck, possibly hitting and denting the

22

23  [12]#17, Ex. 33, at 62-67, 72-81 & 94-103.  Defense counsel maintained in closing argument that the

24  surveillance video tended to establish that Page initially heard rather than saw the first shot. #18, Ex. 44, at 82-86.  Be that as it may, Page testified, including on cross-examination, that he saw rather than merely

25  heard the first shot and that he then saw Payne drop immediately "like a rock" or "like a sack of potatoes."

26  [13]#17, Ex. 33, at 65-68 & 87-103.

27  [14]#17, Ex. 33, at 134-150.

28  [15]#18, Ex. 40, at 224-26.

1    painted headliner and coming to rest on the seat cushion on the passenger side.  The
2    apparent second shot entered through Payne's right cheek near the ear, passed through a
3    number of nonvital tissues, exited on the back of his left neck, reentered his body in his upper
4    left shoulder or back, and came to rest under the skin in his left back.[16]

5          A lay witness who tried, unsuccessfully, to find a pulse before the police and medical
6    responders arrived observed Payne laying on the ground with the left side of his face on the
7    ground and the right side of his face up.  The first responding fire rescue crew similarly found
8    Payne, with no respiration, pulse or cardiac activity, laying with the left side of his face on the
9    ground.  The lividity, or blood pooling, and pattern of final blood flow from the wounds
10   observed during the autopsy additionally tended to establish that Payne was laying on his
11   back when he died.[17]

12         The medical examiner opined that Payne was standing either next to his truck or fairly
13   close to it when the apparent first bullet struck him and he fell backwards.  The examiner
14   opined that the trajectory of the apparent second shot was consistent with Payne then being
15   shot while he was laying on the ground, with the left side of his head turned toward the
16   ground.  The medical examiner acknowledged that this was not the only possible scenario as
17   to Payne's position at the time of the second shot, but his conclusion based upon the physical
18   evidence was that Payne was on his back when the second shot hit him.  The defense expert
19   opined that this scenario as to the second shot was only one of many possible scenarios
20   reflected by the forensic evidence.[18]

21         / / / /

22

23   [16]#17, Ex. 35, at 79-85 & 101 (medical examiner); id., Ex. 36, at 91, 148 & 152-53 (crime scene
24   technicians); id., at 213 & 218-19 (firearm and tool mark examiner); #18, Ex. 38, at 56-57 & 75-76 (defense
     crime scene reconstruction expert).  As testified to by the medical examiner, the aorta is the very large artery
     through which the blood going to the rest of the body passes through after exiting the heart.

25
26   [17]#17, Ex. 34, at 11-37 (John Barr, who testified at one point that the right side of the face was to the
     ground, but this testimony was corrected thereafter); id., at 147-58 (fire rescue); id., Ex. 35, at 87-89 (medical
27   examiner).

28   [18]#17, Ex. 35, at 100-02 & 110-15 (medical examiner); #18, Ex. 38, at 65-71 & 78-85 (defense crime
     scene reconstruction expert).

1    The State's evidence tended to establish that the apparent first shot killed Payne

2 almost immediately, within a span of approximately twenty to thirty seconds, by penetrating

3 the aorta.  The apparent second shot did not pass through any vital structures, such as a

4 major blood vessel or the spinal cord, before exiting the back of the neck and passing through

5 similarly nonvital tissue in Payne's back.[19]

6    A third unfired and ejected cartridge that matched the two fired rounds also was found

7 at the scene.  The tool markings on the ejected cartridge established conclusively only that

8 the round had been loaded into and then cycled through the semiautomatic pistol (*i.e.*,

9 chambered and then extracted from the firing chamber) at some point without being fired.

10 The markings were not inconsistent with the round having jammed during an unsuccessful

11 firing attempt and having been cleared, but the markings did not conclusively establish that

12 the round had jammed.  The markings also were consistent with the cartridge simply having

13 been loaded and then cycled through the pistol normally without firing.  The markings thus

14 also were not inconsistent with a person pulling the slide back and chambering a round when

15 a cartridge already was in the firing chamber, which would result in the previously-chambered

16 round being ejected without being fired.  Neither the State nor the defense expert could opine

17 as to whether the unfired cartridge was ejected before, between, or after the two shots that

18 were fired.[20]

19    At 4:24 p.m. on June 18, 1995, Pinkston left a message on her home answering

20 machine for her infant daughter.  Pinkston said, *inter alia*: "I didn't know what else to do."[21]

21    / / / /

22

23    [19]#17, Ex. 35, at 81-82, 91, 105 & 110 (medical examiner).  The defense crime scene reconstruction

24 expert stated variously that he would defer to the medical examiner as to whether the second shot could have been fatal, that he did not have a position on that issue, and that he "would assume" that the second shot

25 "certainly would have that capability as well."  Regardless of this qualified assumption, the defense expert was neither tendered nor qualified as an expert in forensic pathology.  #18, Ex. 38, at 74-75.

26

27    [20]#17, Ex. 36, at 130-33 & 145-48 (crime scene technician); *id.*, at 211-12, 222-25 & 227-35 (firearm and tool mark examiner); #18, Ex. 38, at 58-61, 76-77 & 81-82 (defense crime scene reconstruction expert).

28    [21]#17, Ex. 35, at 200-03.

-8-

At approximately 5:00 p.m., Pinkston turned herself in at a police station in downtown Las Vegas. She responded affirmatively that she had committed a crime of violence and that the victim was at the Discovery Zone. She informed the desk sergeant that the weapon was in the trunk of her car. When her vehicle was later impounded and searched, the .380 handgun and a seven-round magazine holding four live rounds was found in a purse in the trunk of the vehicle. As of that time, there was nothing else in the purse other than the handgun and magazine. The hard gun case for the handgun was in a brown paper bag in the trunk.[22]

When interviewed shortly thereafter by detectives, Pinkston stated, after learning that Payne had died, that she had shot Payne twice. According to the interviewing detective, she said that "she didn't think she knew what she was doing when she fired the first shot but she did when she fired the second shot." She stated that "she did not know what was going on in her mind." According to the detective's testimony on direct examination, Pinkston did not state to the detectives at that time that she was in fear for her life, that Payne had threatened her prior to the shooting, that she believed that Payne had a gun, or that she fired to protect herself. According to the detective, Pinkston instead said that "she did not know what was going to happen when he got to the truck."[23]

However, when defense counsel went back through the transcript of the statement with the detective on cross-examination, there were numerous exchanges, including key exchanges presented as unequivocal statements on direct, where Pinkston did not complete sentences and/or her voice trailed off as she broke down. The detective testified that Pinkston appeared upset and was crying "on and off" throughout the interview, with the detective stating to Pinkston at the time that she was "acting devastated." When defense counsel went back through the transcript, Pinkston's statements were not necessarily as

---

[22]#17, Ex. 33, at 119-34 (desk sergeant); *id.*, Ex. 35, at 131-36 (detective); *id.*, Ex. 36, at 94-95 & 136-42 (crime scene technicians); *id.*, at 194-95 (firearm and tool mark examiner); #18, Ex. 42, at 96-97 & 172-72 (detectives).

[23]#18, Ex. 42, at 85-95 & 114-15 (detective).

1   unequivocal as the detective's testimony on direct indicated.  Pinkston specifically stated: "I
2   just felt, I did have a gun with me, and I just felt if he had gotten in that car that he was, that
3   would be the end of me."[24]

4          The police did not find a gun in Payne's truck following the shooting.  When the crime
5   scene technicians continued processing the scene after examining and photographing
6   Payne's body, both doors to the truck were locked and the keys were on the ground next to
7   Payne's body.  The driver's side window was broken apparently from a gunshot.[25]

8          Nor did the police find a gun when they searched Payne's residence two days later.
9   Las Vegas police records did not show that a gun was registered to Payne.  A local ordinance
10  requires handgun owners to register their weapons with the local police.[26]  The State called
11  a number of landlords, employers and/or friends who testified that they had not seen Payne
12  with a gun and/or had not heard him speak of having a gun.[27]

13         When the police executed a search warrant of Pinkston's residence, her mother
14  unilaterally directed the police to a three-ring binder.  The binder included materials pertaining
15  to the domestic dispute litigation between Pinkston and Payne.  The first page in the binder
16  was dated June 16, 1995, and stated, *inter alia*:

> To mom, my attorney or whoever has possession of this
> book. . . . .    You may use any contents in my defense or in my
> behalf . . . .

19  #17, Ex. 35, at 152-55 & 215-16.

20         / / / /

21

---

22  [24] #18, Ex. 42, at 98-114 & 115-17 (detective).

23  [25] #17, Ex. 36, at 90-92 & 135-36.

24  [26] #17, Ex. 35, at 121 (search of Payne residence); #18, Ex. 42, at 130-31 (absence of entry in local
25  firearm registration records).  Pinkston had not registered her handgun following her return to Las Vegas after
    purchasing the gun while living in Carson City in March, 1995.  She testified that she was not aware of the
26  Clark County local registration requirement.  #17, Ex. 33, at 104-18 (Pinkston's gun purchase in Carson City);
    *id.*, Ex. 35, at 182-86 (materials associated with Pinkston's handgun found at her residence).

27
28  [27] #18, Ex. 42, at 125 (Helen Redford); *id.*, at 136-38 (James Schollard, who testified specifically
    about what he saw in Payne's truck); *id.*, at 151 (Jacques Jasmin); *id.*, at 155 (Lee Bennett).

-10-

Pinkston maintained that the cover page to the binder had been there continuously prior to June 1995 and that the binder contained "all the family court papers."  She testified that she had updated the cover page with a June 16, 1995, date because the prior cover page had worn out.[28]

The binder included, *inter alia,* the guardianship document that Pinkston had notarized on June 18, 1995.[29]

The police also found a spiral bound notebook that included the "options" memo in which Pinkston discussed various options.[30]

At trial, the state district court instructed the jury, *inter alia*, as follows:

> Murder of the first degree is murder which is perpetrated by any kind of wilful, deliberate, and premeditated killing of another human being.
>
> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> The law does not undertake to measure in units of time the length of the period during which premeditation is formed. *It may be as instantaneous as successive thoughts of the mind*.  The test is not the duration of time, but rather the actual formation of premeditation.  If the State proves beyond a reasonable doubt *that the act constituting the killing has been preceded by and has been the result of premeditation*, no matter how rapidly the premeditation is followed by the act constituting the killing, *it is willful, deliberate and* premeditated murder.

#18, Ex. 47, Instruction Nos. 7 and 8 (emphasis added).

The trial court rejected a proposed defense instruction that instead would have charged the jury as follows:

> Premeditation is a design -- a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.

---

[28]#18, Ex. 40, at 175-79.

[29]#17, Ex. 35, at 155-59.

[30]#17, Ex. 35, at 161-65.

*Deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed [course] of action.*

The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly *deliberate and premeditated.*  The time will vary with different individuals and under varying circumstances.

The true test is not the duration of the time, but rather the extent of the reflection.  A cold, calculated judgment and decision may be arrived at in a short period of time*, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree.*

#18, Ex. 45, at electronic docketing page 7 (emphasis added).

During closing argument, the State relied upon evidence, such as the options memo, that the prosecution maintained established that Pinkston planned to murder Payne and went to the Discovery Zone specifically to carry out this purpose.

The State further argued, however, pursuant to Jury Instruction No. 8, that Pinkston would be guilty of first-degree murder even if she had formed an intent to kill Payne instantaneously.  The prosecutor argued:

Some lay persons come to court with the notion that premeditation requires extensive planning.  Judge Leavitt clarifies this issue.  He continues in Instruction No. 8, the law does not undertake to measure in units of time the length of the period during which premeditation is formed.  It may be as instantaneous as successive thoughts of the mind.

I'd like to give you an example.  I'm sure we've all been in this situation. . . . .  We're going 45 miles an hour in a 35 zone, and we are confronted with a yellow light and you need to decide, do you go through the light or do you stop?  But what happens?  The first thing you do is look down at your speedometer.  How fast am I speeding now?  Do I speed up even more?  You look around.  Any cops here?  You look in your rear-view mirror.  Is there a big semi behind me?  If I slam on my brakes, am I going to be in an accident?

That total thought process is done within a second.  That is sufficient for premeditation. . . . .

#18, Ex. 44, at 40-41.

/ / / /

-12-

1    The prosecutor accordingly likened the amount of prior intention required to convict for

2    first-degree murder to the literally split-second decision to speed through an intersection

3    against a yellow light.

4    In the rebuttal argument, the State again relied upon evidence that it maintained

5    established preplanning.  The prosecutor reiterated, however, four paragraphs from the end

6    of the argument:

7                . . . . Premeditation and deliberation need not be for a day,
     an hour, or even a second.  It can be as instantaneous as
8    successive thoughts in the mind. . . . .

9    #18, Ex. 44, at 162.

10                                 ***Discussion***

11   The Court reaches only Ground 3 of the amended petition.

12   In Ground 3, petitioner alleges that she was denied due process in violation of the Fifth

13   and Fourteenth Amendments because the trial court's jury instructions allegedly failed to

14   adequately distinguish between the elements of malice aforethought, premeditation, and

15   deliberation.  Petitioner maintains, *inter alia*, that the premeditation instruction used in her

16   case constituted what is referred to under Nevada state practice as a *Kazalyn* instruction, as

17   a substantially similar instruction first appeared in a published decision in *Kazalyn v. State*,

18   108 Nev. 67, 825 P.2d 578 (1992).[31]  The Supreme Court of Nevada later concluded in

19   *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000), that the *Kazalyn* instruction "blur[red] the

20   distinction between first- and second-degree murder" by not sufficiently distinguishing

21   between the distinct elements of deliberation and premeditation.  *See* 116 Nev. at 235, 994

22   P.2d at 713.  The state supreme court subsequently held, however, that *Byford* did not signify

23   that the giving of the *Kazalyn* instruction violated any constitutional rights, such that the *Byford*

24   holding was not a holding of constitutional dimension that must be retroactively applied.

25   *Garner v. State*, 116 Nev. 770, 6 P.3d 1013, 1025 (2000), *overruled on other grounds by*

26   *Sharma v. State*, 118 Nev. 648, 56 P.3d 868 (2002).  The Ninth Circuit has held, however,

27

28        [31] *Compare* #18, Ex. 47, Instruction No. 8, *with Kazalyn*, 108 Nev. at 75, 825 P.2d at 583.

                                          -13-

1    that the giving of a *Kazalyn* instruction deprives a defendant of due process, subject to

2    harmless error analysis.  *Polk v. Sandoval*, 503 F.3d 903, 909-11 (9th Cir. 2007).

3           In a prior ruling in the present case, the Court held that an independent substantive

4    federal constitutional claim of jury instruction error in this regard – including specifically a

5    federal constitutional claim based upon the *Kazalyn* error in failing to distinguish between

6    premeditation and deliberation – had not been fairly presented in the state courts through to

7    the state supreme court.[32]

8           The Court held that, *inter alia*, Ground 3 was constructively exhausted, however,

9    because it was more probable than not that the state supreme court would apply law of the

10   case to the only conceivable basis for overcoming state procedural bars to the substantive

11   claim – *i.e.,* reliance upon ineffective assistance of appellate counsel to establish cause – if

12   petitioner were to return to state court to exhaust the claim.  On state post-conviction review,

13   the Supreme Court of Nevada clearly addressed and rejected a claim that appellate counsel

---

[32]In the answer, respondents urge that federal Ground 3 presents only a claim of jury instruction error based upon a failure to distinguish between malice aforethought and premeditation/deliberation and not a claim of error based upon a failure to distinguish between premeditation and deliberation.  Respondents maintain that the *Byford* decision thus is inapposite to the claim of jury instruction error purportedly actually presented in federal Ground 3.

   Respondents' argument misses the mark.  Petitioner does indeed present allegations in federal Ground 3 asserting that the instructions did "not distinguish between the concepts of express malice and premeditation/deliberation." #22-2, at 10, lines 4-5.  Ground 3 further alleges, however, specifically and expressly invoking *Byford*, that the instructions given in her case further impermissibly blurred the distinction between premeditation and deliberation.  *Id.*, at 10-11.  This Court accordingly properly construed federal Ground 3 in its prior ruling as including a claim specifically of *Kazalyn* error. #29, at 8-9 & 11.  An independent substantive claim of federal constitutional error based upon the *Kazalyn* error was not fairly presented to the state courts through to the state supreme court.  Such a claim is constructively exhausted, however, as discussed in the text.

   In this same vein, respondents urge in the answer that federal Ground 3 presents only a state law claim of jury instruction error that has no federal constitutional implications.  Under controlling Ninth Circuit precedent, however, petitioner clearly presents a federal constitutional claim.  Indeed, the Ninth Circuit held in *Polk* that the Nevada Supreme Court's conclusion that the error did not give rise to a federal due process violation was contrary to clearly established federal law as determined by the United States Supreme Court.  503 F.3d at 911.  Petitioner thus not only clearly presents a federal claim, she presents a federal due process claim that, subject to harmless error analysis, is a viable claim under Ninth Circuit precedent that is binding on this Court.

   Respondents' effort to recast petitioner's claim as one that does not present a *Kazalyn* error and that further does not present a federal due process claim thus is unpersuasive.

was ineffective for failing to raise a claim of *Kazalyn* error as recognized in *Byford* as a federal constitutional claim.[33]   This Court concluded that the chances were "virtually nil" that the Supreme Court of Nevada would not apply law of the case to its prior rejection of this claim of ineffective assistance of appellate counsel if petitioner sought to exhaust the underlying independent substantive claim.   The Court therefore held that, given that there was no chance now that the substantive claim would be heard on the merits due to the application of state procedural bars, the claim was constructively exhausted.[34]

Respondents, per the scheduling order entered for the case, then moved to dismiss, *inter alia*, Ground 3 on the basis of procedural default.   The Court rejected petitioner's arguments for avoiding the procedural default of Ground 3 with the exception of her reliance upon ineffective assistance of appellate counsel to establish cause and prejudice excusing the default.   The Court deferred further consideration of this issue until after the filing of an answer and reply that more fully addressed the underlying facts and law pertaining to whether petitioner was denied effective assistance of appellate counsel in this regard.[35]

---

[33]#20, Ex. 101, at 8-9.

[34]#29, at 8-12.

[35]#33.  Petitioner reurges in the reply arguments that the Court considered and rejected in the prior order (#33).  The prior order was not an invitation to reurge procedural default arguments that the Court already had rejected and as to which petitioner already had made her record.  The Court instead was looking for argument directed to the merits of Ground 3 as it pertained to whether petitioner was denied effective assistance of appellate counsel in failing to raise the claim as establishing cause and prejudice excusing the procedural default of Ground 3.

To reiterate, the Court never has held herein that the independent substantive claim in Ground 3 itself would be barred by law of the case.  As stated in #33, "[t]he Court instead held that "[t]he likelihood that the Supreme Court of Nevada would revisit its holding on the *ineffective assistance claim* rather than apply the law of the case doctrine to *a claim of cause and prejudice based upon such alleged ineffective assistance* is virtually nil." #33, at 4 (emphasis in original).  Petitioner's continued reliance in the reply upon the Supreme Court's *Ylst* and *Cone* decisions thus is misplaced.  The holdings in these cases do not resolve the issue of whether the substantive claim in Ground 3 should be barred by procedural default.  The Nevada law of the case doctrine is relevant here only to establish that the Supreme Court of Nevada is not likely to revisit the ineffective assistance claim relied upon by petitioner to establish cause and prejudice.  See #33, at 3-4.

Petitioner's contention that the state supreme court adjudicated the merits of Ground 3 when it considered whether she was denied ineffective assistance of appellate counsel in failing to raise the claim

(continued...)

The Court now reaches the procedural default issue reserved in the prior order.  That is, the Court reaches the question of whether petitioner can establish ineffective assistance of appellate counsel in failing to raise the claims in Ground 3 on direct appeal, as a basis for establishing cause and prejudice excusing the procedural default of the underlying independent substantive claims in Ground 3.

Under the procedural default doctrine, federal review of a habeas claim may be barred if the state courts rejected the claim on an independent and adequate state law ground due to a procedural default.  Federal habeas review will be barred on claims rejected on an independent and adequate state law ground unless the petitioner can demonstrate either: (a) cause for the procedural default and actual prejudice from the alleged federal law violation; or (b) that a fundamental miscarriage of justice will result absent review.  *See,e.g.,Bennet v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).  To demonstrate cause for a procedural default, the petitioner must establish that some external and objective factor impeded her efforts to comply with the state's procedural rule.  *E.g., Hivala v. Wood*, 195 F.3d 1098, 1105 (9th Cir. 1999).  To satisfy the prejudice requirement, she must show that the alleged error resulted in actual harm.  *E.g., Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998).

A petitioner may seek to establish cause by showing that the procedural default resulted from a constitutional deprivation of effective assistance of counsel under the

---

[35](...continued)
similarly is unpersuasive.  A determination of whether a petitioner has been prejudiced by alleged ineffective assistance of appellate counsel in failing to raise a substantive claim – and/or of whether the petitioner can establish cause and prejudice to overcome a procedural bar to the claim – does not constitute an adjudication of the merits of the underlying substantive claim which overcomes a procedural default.  If the procedural default of an underlying substantive claim could be avoided based upon this circular argument any time that a state court considered a claim of prejudice on an ineffective assistance claim and/or on an effort to overcome a state procedural bar, the procedural default doctrine would be largely dead letter.  In any event, it is firmly established law that review of a defaulted claim will be barred even if the state court also rejected the claim on the merits in the same decision.  *See,e.g.,Bennet v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).

The controlling question under this Court's prior rulings at this point instead is whether petitioner was denied effective assistance of appellate counsel when direct appeal counsel failed to raise the claims in federal Ground 3 on direct appeal.  That is the only question as to procedural default that was left open for further argument in the answer and reply.  Petitioner, again, already had made her record as to her other arguments, and – absent a motion for reconsideration – continued argument as to procedural default issues that had been fully briefed and decided was not contemplated or sanctioned by the Court's prior order.

1  Strickland[36] standard.  See,e.g., Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645,

2  91 L.Ed.2d 397 (1986).

3       The Third and Sixth Circuits have held that when a federal habeas court evaluates a

4  claim of ineffective assistance of counsel for purposes of determining whether the petitioner

5  can establish cause to overcome a procedural default, the court applies de novo review rather

6  than deferential review under the AEDPA.  See Hall v. Vasbinder, 563 F.3d 222, 236-37 (6th

7  Cir.2009);  Joseph v. Coyle, 469 F.3d 441, 459 (6th Cir.2006); Fischetti v. Johnson, 384 F.3d

8  140, 154-55 (3d Cir.2004).  The Court finds the reasoning behind these decisions as

9  articulated by the Third Circuit in Fischetti persuasive and accordingly considers the issue de

10  novo herein.

11       Under Strickland, a petitioner must establish that (1) her counsel's performance was

12  deficient, and (2) she suffered prejudice as a result.  466 U.S. at 687, 104 S.Ct. at 2064.  To

13  be deficient, an attorney's conduct must fall below an "objective standard of reasonableness"

14  established by "prevailing professional norms."  464 U.S. at 687-88, 104 S.Ct. at 2064-65. To

15  demonstrate prejudice, the petitioner does not need to show that her counsel's deficient

16  performance more likely than not affected the outcome of the case. Rather, she must

17  demonstrate only a "reasonable probability that, but for counsel's unprofessional errors, the

18  result of the proceeding would have been different." 464 U.S. at 694, 104 S.Ct. at 2068.  A

19  "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."

20  Id.

21       When evaluating claims of ineffective assistance of appellate counsel, the

22  performance and prejudice prongs of the Strickland standard substantially overlap.  E.g.,

23  Bailey v. Newland, 263 F.3d 1022, 1028-29 (9th Cir. 2001); Miller v. Keeney, 882 F.2d 1428,

24  1434 (9th Cir. 1989).  On the one hand, the failure to present a weak argument on direct

25  appeal neither falls below an objective standard of competence nor causes prejudice to a

26  petitioner for the same reason – because the omitted issue had little or no likelihood of

27

28       [36] Strickland v. Washington, 466 U.S. 668, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

-17-

1  success.  *Id.*  On the other, the failure to present a strong issue on appeal can both constitute

2  deficient performance and cause prejudice also for the same reason – because appellate

3  counsel failed to pursue an issue that had a reasonable probability of changing the outcome

4  of the proceeding.  Accordingly, the reviewing court must look to the merits of the omitted

5  issue to properly address a claim of ineffective assistance of appellate counsel.  *E.g.,*

6  *Moormann v. Ryan*, 628 F.3d 1102, 1106-07 (9th Cir. 2010).

7  The Court therefore looks to the merits of Ground 3, in seeking to determine whether

8  petitioner was deprived of effective assistance of appellate counsel in order to determine, in

9  turn, whether she can establish cause and prejudice to overcome the procedural default of

10  the claims in Ground 3.

11  The Supreme Court of Nevada concluded in *Byford*, which was on appeal at the same

12  time as Pinkston's appeal, that the *Kazalyn* instruction erroneously "blur[red] the distinction

13  between first- and second-degree murder" by failing to adequately distinguish between the

14  distinct elements of deliberation and premeditation required for a conviction for first-degree

15  murder as opposed to lesser homicide offenses.  116 Nev. at 234-36 & n.4, 994 P.2d at 713-

16  14 & n.4.  The state supreme court approved a jury instruction in lieu of the *Kazalyn*

17  instruction that expressly and specifically distinguished between the three separate elements

18  of willfulness, deliberation and premeditation.  The instruction approved in *Byford*, *inter alia*,

19  carried forward the concept that premeditation "may be as instantaneous as successive

20  thoughts of the mind."  The instruction further stated, however, that "[a] mere unconsidered

21  and rash impulse is not deliberate, even though it includes the intent to kill."  The approved

22  instruction concluded: "A cold, calculated judgment and decision may be arrived at in a short

23  period of time, but a mere unconsidered and rash impulse, even though it includes an intent

24  to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first

25  degree."  116 Nev. at 236-37, 994 P.2d at 714-15.

26  The instruction approved in *Byford* was substantially similar to the instruction requested

27  by defense counsel and rejected by the state district court at Pinkston's trial.  The defense

28  proposed instruction concluded, *verbatim*, with the same sentence quoted above that

-18-

1  concludes the instruction approved in *Byford*.[37]  At Pinkston's trial, the state district court

2  instead gave the *Kazalyn* instruction.  That instruction included no language precluding a

3  conviction for first-degree murder for a killing committed following "a mere unconsidered and

4  rash impulse."  The instruction instead included only the language that premeditation could

5  be "as instantaneous as successive thoughts of the mind."  The instruction directed the jury

6  that "[i]f the State proves beyond a reasonable doubt that the act constituting the killing has

7  been preceded by and has been *the result of premeditation, no matter how rapidly the*

8  *premeditation is followed by the act constituting the killing,* it is *wilful, deliberate*, *and*

9  premeditated murder.[38]

10       The Supreme Court of Nevada subsequently held that the giving of a *Kazalyn*

11  instruction does not give rise to a federal due process violation.  *Garner, supra*.  The Ninth

12  Circuit has held, however, that the state supreme court's holding rejecting the federal due

13  process claim was contrary to clearly established federal law -- *based entirely upon controlling*

14  *United States Supreme Court precedent decided prior to Pinkston's trial and appeal*.  *See*

15  *Polk*, 503 F.3d at 909-11.  The role that the *Kazalyn* charge played in the charge as a whole

16  and the exacerbating effect of the State's reliance upon the *Kazalyn* instruction in closing

17  argument make this case virtually indistinguishable from *Polk* in this regard.  *See id.*  This

18  Court of course is bound by the Ninth Circuit's holding that the state supreme court's

19  conclusion that there is no federal due process violation is contrary to clearly established

20  federal law as determined by the United States Supreme Court.[39]

21

22       [37]#18, Ex. 46, at electronic docketing page 9.

23       [38]#18, Ex. 47, Instruction No. 8 (emphasis added).

24       [39]To the extent that the Nevada Supreme Court disagrees with *Polk*'s analysis of the constitutional

25  issue in *Nika, supra,* this Court is bound by the Ninth Circuit's *Polk* decision as to the application of clearly
    established federal law rather than the analysis in the Nevada Supreme Court's *Nika* decision.  While the

26  Nevada Supreme Court has sought to recast the *Kazalyn* issue as – in one fashion or another – a purely
    state law issue in *Garner* and then in *Nika*, the Ninth Circuit to date has been unpersuaded, at least following

27  *Garner*.  *See,e.g., Polk*, 503 F.3d at 911 ("Instead of acknowledging the violation of Polk's due process right,
    the Nevada Supreme Court concluded that giving the *Kazalyn* instruction in cases predating *Byford* did not

28                                                                                    (continued...)

1    Such a federal due process violation, however, is subject to harmless error analysis.

2    *Polk*, 503 F.3d at 911.  A defendant or petitioner will be entitled to relief only if "'the error had

3    a substantial and injurious effect or influence in determining the jury's verdict.'" *Polk*, 503 F.3d

4    at 911 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353

5    (1993)).  If the record leaves the reviewing court in "grave doubt" as to whether the error had

6    such an effect, the defendant or petitioner is entitled to relief.  *Id.*[40]

7    For example, in *Polk*, the evidence of deliberation consisted of the following: (1) Polk

8    had threatened and fought with the victim two months before, (2) there was a loud argument

9    shortly before gunshots were heard; and (3) Polk wore a bulletproof vest on the evening of

10   the murder.  The Ninth Circuit concluded that this evidence "was not so great that it precluded

11   a verdict of second-degree murder."  The court noted that prior statements made as a result

12   of agitation or emotional distress do not always connote an intent to actually commit violence,

13   that an argument prior to the homicide actually tended to support a conclusion that the killing

14   was not done with "coolness and reflection," and that donning a bulletproof vest potentially

15   reflected a defensive step as opposed to deliberation to commit murder.  When these

16   competing inferences were coupled with a jury instruction and prosecutorial argument that

17   all that was required was successive thoughts of the mind, the court stated that "we simply

18   cannot conclude that the *Kazalyn* error was harmless."  503 F.3d at 912-13.

19

20   [39](...continued)
constitute constitutional error. In doing so, the Nevada Supreme Court erred by conceiving of the *Kazalyn*

21   instruction issue as purely a matter of state law."); *see also Chambers v. McDaniel*, 549 F.3d 1191, 1190 &
n.1 (9th Cir. 2008)(declining to reach respondents' argument that *Polk* was wrongly decided because the

22   subsequent panel was bound by the prior panel opinion in *Polk*).

23   Respondents' rely upon Instruction No. 10 in this case as clarifying the distinction between first- and
second-degree murder. #35, at 21.  The instruction in question, however, defines second-degree murder in

24   pertinent part as an unlawful killing where there is malice aforethought, "but the evidence is insufficient to
establish premeditation and deliberation." #18, Ex. 47, Instruction No. 10.  If the charges specifying what

25   evidence is sufficient "to establish premeditation and deliberation" are defective, Instruction No. 10 then
merely incorporates and perpetuates the same error rather than corrects the error.

26

27   [40]The Court notes that the standard applied by the Supreme Court of Nevada while addressing the
claim of ineffective assistance of appellate counsel was not the same as the *Brecht* harmless error standard.

28   The state supreme court instead looked to whether the evidence supporting the first-degree murder charge
was "significant," which is not the same as the *Brecht* harmless error standard. #20, Ex. 101, at 8-9.

-20-

In the subsequent decision in *Chambers v. McDaniel*, 549 F.3d 1191 (9th Cir. 2008), the Ninth Circuit addressed the issue of harmless error as to a *Kazalyn* error in a case where the State relied upon evidence "that Chambers stabbed Chacon seventeen times; that the wounds penetrated three inches into the body and were located in two separate clusters of wounds; and that Chambers was not mentally disturbed, but at the most merely drunk." The court concluded that this evidence did "not demonstrate the key feature of the element of deliberation" as the evidence "[i]f anything . . . seems to weigh in favor of second-degree murder committed while in the throes of a heated argument." The court noted the state supreme court's description of the evidence that "'Chambers murdered the victim in a drunken state, which indicated no advanced planning, during an emotionally charged confrontation in which Chambers was wounded and his professional tools were being ruined.'" The Ninth Circuit concluded that "'[s]ince we are left 'in grave doubt' about whether the jury would have found deliberation on [Chambers'] part if it had been properly instructed, we conclude that the error had a substantial and injurious effect or influence on the jury's verdict.'" 549 F.3d at 1200-01.

In the present case, the trial record similarly gives rise to grave doubt for a reviewing court in considering whether the *Kazalyn* error had a substantial and injurious effect on the jury's verdict. To be sure, a jury potentially could infer deliberation from the options memo – prepared up to three weeks prior to the incident – and Pinkston's having the guardianship document notarized on the day of the shooting. Yet, as in *Polk* and *Chambers*, this evidence did not preclude a verdict of second-degree murder. Under the law and closing arguments presented, the jury could have convicted Pinkston of first-degree murder even if it believed both: (a) Pinkston's position that the options memo was merely an effort to work through her problems in writing one day, consistent with her sociology training, rather than a declaration of an actual intent to kill Payne; and (b) that she notarized the guardianship document that day because she was concerned for her own safety and she was preparing to file the document in court the next day. All that the jury needed to believe to convict Pinkston of first-degree murder on the law given and arguments made at her trial was that Pinkston formed

1   the intent to kill Payne as she fired, as all that was required was  a state of mind "as

2   instantaneous as successive thoughts of the mind."[41]

3       In this regard, the fact that Pinkston fired a second time after an interval potentially of

4   ten seconds is not in and of itself determinative.  The defendant in *Polk* fired multiple times,

5   hitting the victim twice, and, similar to the present case, the prosecution relied upon the

6   multiple shots to establish the requisite state of mind for first degree murder.  *Compare* 503

7   F.3d at 905 *with* #18, Ex. 44, at 43.  And, as noted above, the defendant in *Chambers* struck

8   the victim multiple times with the knife.  In neither case was the fact of multiple shots or knife

9   strikes determinative of the harmless error issue.   Moreover, in the present case, the

10  evidence tended to establish that it was the first rather than the second shot that dropped

11  Payne "like a rock" and killed him.  Pinkston's state of mind when she fired the second shot

12  did not establish her state of mind when she fired the first and fatal shot.

13      The *Kazalyn* error accordingly was not harmless error in Pinkston's case under the

14  *Brecht* standard.[42]

15      Pinkston's appellate counsel thus failed to raise a federal due process claim as to jury

16  instruction error that was supported by then-existing established United States Supreme

17  Court precedent and that went to the very heart of the case – state of mind.  If adjudicated

18  on the merits, the issue is a winning issue on the merits on federal habeas review, even

19  following the adoption of deferential review under the AEDPA.  The Ninth Circuit has held that

20

21      [41]#18, Ex. 44, at 40 (State's closing argument).

22      [42]The Court additionally notes that a cold and calculated judgment to commit murder would have

23  been more reflected by a killer staying out of view and laying in wait for Payne to exit the building, walking
    directly up and shooting him, and promptly seeking to leave the scene before she could be identified.

24  Pinkston instead went up to a business in broad daylight, directly interacted with at least one potential
    witness, had a discussion and argument with Payne over an extended period in plain view of numerous

25  witnesses at a facility with multiple surveillance cameras, fairly precipitously shot Payne as he was walking to
    his truck following that argument, left fairly quickly but with a trail of witnesses in her wake, and turned herself

26  into the police a relatively short time after the shooting.  While a first-degree murder verdict by a properly-
    instructed jury perhaps might have withstood a challenge to the sufficiency of the evidence, that is not the

27  standard for determining harmless error.  Given the highly debatable and hotly contested issue of state of
    mind in the case and the arguable competing inferences that could be drawn from the evidence relied upon

28  the State to establish that state of mind, the *Kazalyn* error was not harmless under the *Brecht* standard.

-22-

1   the state supreme court's failure to recognize the federal due process error is contrary to

2   clearly established federal law, based upon United States Supreme Court precedent that was

3   on the books at the time of Pinkston's trial.  It clearly was deficient performance to not raise

4   such a strong federal constitutional issue on direct appeal.  Even if, *arguendo*, the state of

5   Nevada decisional law as to what instruction the state supreme court approved was not clear,

6   the requirements of federal due process in this context were clear, under clearly established

7   Supreme Court precedent at the time of Pinkston's trial.  The jury instructions could not

8   eliminate the State's burden of proof on an element that must be proved to establish first-

9   degree murder, and the *Kazalyn* instruction did so as to deliberation.  *Polk*, 503 F.3d at 911.

10   Appellate counsel therefore provided deficient performance in failing to raise the claims

11   in federal Ground 3 on direct appeal.[43]

12   On the prejudice prong, the Supreme Court of Nevada – to this day – does not

13   recognize the presence of a federal due process violation arising from the giving of a *Kazalyn*

14   instruction.  The state supreme court has held that the giving of a *Kazalyn* instruction does

15   not violate federal due process guarantees, a stance that the Ninth Circuit has held is contrary

16   to clearly established federal law as determined by the United States Supreme Court.  *Polk,*

17   *supra.*  The result on Pinkston's direct appeal therefore would not have been different even

18   if a federal claim based upon the *Kazalyn* error had been presented and fully briefed by

19   appellate counsel.

20   The prejudice prong of *Strickland*, however, requires that there be a reasonable

21   probability that the result of the "proceeding" would have been different, with a reasonable

---

23   [43]The attorney who briefed the appeal acknowledged at the state post-conviction evidentiary hearing
24   that federal case law as to jury instruction error, "undoubtedly existed," but he did not cite it.  Counsel testified
     that he believed that he adequately presented a federal issue merely by stating in the conclusion paragraph of
     the reply brief that petitioner was deprived of her right to a "fair trial."  See #20, Ex. 87, at 6-12.  This belief
25   clearly was erroneous and objectively unreasonable when counsel briefed the appeal in July 1998 and
     February 1999.  *See,e.g., Gray v. Netherland*, 518 U.S. 152, 162-63, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457
26   (1996); *Johnson v. Zenon*, 88 F.3d 828 (9th Cir. 1996); *see also Hivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir.
     1999).  A belief that counsel could present a serious and substantial federal due process claim by failing to
27   cite apposite United States Supreme Court authority and instead only referring conclusorily to a right to a "fair
     trial" in a generic concluding sentence in a reply brief fell below an objective standard of reasonableness
28   established by prevailing professional norms.

-23-

1   probability being a probability sufficient to undermine confidence in the outcome of the

2   "proceeding."  464 U.S. at 694, 104 S.Ct. at 2068.  While the proceeding in question in this

3   context generally will be the appeal itself, the Court is persuaded by the Seventh Circuit's

4   holding that the pertinent proceeding extends to later discretionary review and/or federal

5   habeas review, such that the failure to preserve a claim on direct appeal that would lead to

6   a different outcome on later review establishes the requisite prejudice under *Strickland. See*

7   *Freeman v. Lane*, 962 F.3d 1252, 1258-59 (7th Cir. 1992).  The outcome of a direct appeal

8   in this instance would not have been different only because the state supreme court has

9   rejected the federal claim based upon a holding that is contrary to clearly established federal

10  law.  It would be a strange result indeed if a petitioner could not establish prejudice from

11  appellate counsel's failure to preserve the federal claim in that situation on an ineffective

12  assistance claim reviewed *de novo*.[44]

13      The Court accordingly holds that appellate counsel provided ineffective assistance of

14  counsel.  Counsel's failure to raise a federal due process claim based upon the *Kazalyn* error

15  constituted deficient performance and petitioner sustained prejudice as a result of counsel's

16  deficient performance.

17      The ineffective assistance of appellate counsel establishes cause for the procedural

18  default.  *Murray v. Carrier, supra*.  The Court further concludes that prejudice has been

19  established as to the procedural default.  The prejudice that demonstrates ineffective

20  assistance of counsel also demonstrates prejudice as to a procedural default.[45]  Moreover,

21  in all events, consistent with the discussion above, the Court concludes that the underlying

22

23      [44]As the Seventh Circuit acknowledged in *Freeman*, and this Court acknowledges herein, the
24  Supreme Court of Nevada of course is not bound to follow the decisions of a federal circuit court.  This Court,
    however, is bound by the Ninth Circuit precedent in *Polk* when considering a claim of ineffective assistance of
25  counsel in connection with a claim of cause and prejudice to overcome a procedural default.  Under that
    binding circuit precedent, the state supreme court's federal law holding is contrary to clearly established
    federal law as determined by the United States Supreme Court.

26

27      [45]*See Johnson v. Sherry*, 586 F.3d 439, 447 n.7 (6th Cir. 2009), *cert. denied*, ___ U.S. ___, 131 S.Ct.
    87, 178 L.Ed.2d 242 (2010)(standards overlap); *Joseph v. Coyle*, 469 F.3d 441,  (6th Cir. 2006) (*Strickland*
28  prejudice establishes prejudice for purposes of cause and prejudice); *Prou v. United States*, 199 F.3d 37, 49
    (1st Cir. 1999)("one and the same"); *Mincey v. Head*, 206 F.3d 1106, 1147 n.86 (11th Cir. 2000)(same).

1     *Kazalyn* error clearly worked to petitioner's actual and substantial disadvantage, infecting her

2     entire trial with error of constitutional dimensions, satisfying the relevant prejudice standard.[46]

3         The Court accordingly considers Ground 3 despite the procedural default of the

4     independent substantive claim in the state courts.  Because the state courts did not review

5     the procedurally barred substantive claim on the merits, it is reviewed *de novo* in federal

6     court.  *E.g., Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005).  For the reasons

7     discussed above, the Court concludes on *de novo* review of Ground 3 that the use of the

8     *Kazalyn* charge in Pinkston's case deprived petitioner of due process of law and did not

9     constitute harmless error.

10        The Court therefore will grant a conditional writ of habeas corpus as further specified

11     below.  The Court thus does not reach the remaining claims presented.[47]

12        IT THEREFORE IS ORDERED that the petition for a writ of habeas corpus is

13     conditionally GRANTED and that, accordingly, the state court judgment of conviction hereby

14     is VACATED and petitioner shall be released from custody within thirty (30) days of the later

15     of the conclusion of any proceedings seeking appellate or *certiorari* review of the Court's

16     judgment, if affirmed, or the expiration of the delays for seeking such appeal or review, unless

17     the State files a written election in this matter within the thirty day period to retry petitioner and

18     thereafter commences jury selection in the retrial within one hundred twenty (120) days

19     following the election to retry petitioner, subject to reasonable request for modification of the

20     time periods in the judgment by either party pursuant to Rules 59 or 60.

21        / / / /

22

23         [46] *See Murray v. Carrier*, 477 U.S. at 494, 106 S.Ct. at 2648 (prejudice standard).

24         [47] The Court's alternative dispute resolution resources are available to the parties at any time.  At the
time of the offense, a defendant convicted of first-degree murder with the use of a dangerous weapon and

25     sentenced to consecutive sentences of life with the possibility of parole would be eligible for consideration for
parole on each sentence after a minimum of ten years had been served on the sentence.  A defendant

26     convicted instead of second-degree murder with the use of a deadly weapon and sentenced to consecutive
sentences of life or less would be eligible for consideration for parole on each sentence after a minimum of

27     five years had been served on each sentence.  *See* N.R.S. 200.030, as amended through 1989 Laws, ch.
408, § 1, p. 865, ch. 631, § 1, p. 1451.  It would appear that petitioner has been incarcerated approximately

28     fourteen years at this juncture.

1    The Clerk of Court shall enter final judgment accordingly in favor of petitioner and

2  against respondents, conditionally granting the petition for a writ of habeas corpus as

3  provided above.

4    The Clerk further shall provide a copy of this order and the judgment to the Clerk of

5  the Eighth Judicial District Court, in connection with that court's No. C130789.

6    DATED:  March 22, 2011

7

8

9

10  _____

11  KENT J. DAWSON
    United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28