UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| BARBARA A. PINKSTON,<br><br>                           Petitioner,<br>   v.<br><br>SHERYL FOSTER, et al.,<br><br>                         Respondents. | Case No. 2:07-cv-01305-KJD-EJY<br><br>ORDER |

Barbara A. Pinkston's second-amended petition for writ of habeas corpus comes before the court for a decision on the remaining claims (ECF No. 69). This court previously granted a conditional writ of habeas relief on ground 3 – a claim that Pinkston was denied Fifth and Fourteenth Amendment due process because the trial court's jury instructions failed to adequately distinguish between the elements of malice aforethought, premeditation, and deliberation (ECF No. 42). The Ninth Circuit reversed in light of its decision several days earlier in *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013) (ECF No. 52). In sum, ground 3 was dismissed as procedurally barred, and the petition was remanded for consideration of the remaining claims (ECF Nos. 67).

Pinkston's second-amended petition sets forth the nine grounds from her first amended petition (with placeholder, as instructed by this court) and adds ground 10 (ECF No. 69). As ground 10, Pinkston contends that the Nevada Supreme Court violated her Fifth and Fourteenth Amendment due process rights when it failed to apply the rule announced in *Byford v. State*, 994 P.2d 700, 712 (Nev. 2000) to her case because *Byford*

1

narrowed the scope of conduct that could be defined as premeditated murder before Pinkston's conviction became final. *Id.* at 45-47.

## I.     Procedural History and Background

As set forth in its order granting habeas relief, Pinkston seeks to set aside her 1997 Nevada state conviction, pursuant to a jury verdict, of first-degree murder with the use of a deadly weapon.

Pinkston was convicted of the murder of Greg Payne on Father's Day, June 18, 1995. It was undisputed that Pinkston shot Payne twice with a .380 caliber semiautomatic handgun as he was walking toward his truck. The dispute at trial focused upon the circumstances leading up to the shooting, Pinkston's state of mind, and her defense that she was a domestic violence victim and reasonably believed that Payne intended to kill her.[1]

Pinkston met Payne initially when he responded to her ad in October 1992 looking for a roommate to help with the rent on her house. The roommate relationship began as a platonic one, but Pinkston and Payne became romantically involved in November 1992. The romantic relationship was a rocky one, however, basically from its inception. The relationship also produced a daughter even as it initially unraveled. In

---

[1] *See, e.g.*, exh. 33, at 23-24, 31-33, 41-42 & 47 (defense opening statement). Exhibits referenced in this order are exhibits to petitioner's first-amended petition, ECF No. 15, and second-amended petition, ECF No. 69, and are found at ECF Nos. 16-20, 70, 83.

The following summary in the text is intended only as an overview of the basic factual particulars of the case in order to provide context for the discussion of the issues. Any absence of mention of specific evidence in this overview does not signify that the Court has overlooked or ignored that evidence in considering a particular issue.

The court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The court summarizes same solely as background to the issues presented in this case. No statement of fact made in describing statements, testimony or other evidence in the state court, whether in this overview or in the discussion of a particular issue, constitutes a finding by this court.

2

addition to producing a child, the relationship lead to a number of judicial proceedings concerning, inter alia, protection orders and child visitation.[2]

A court hearing was scheduled for Monday, June 19, 1995, to address custody and visitation of their daughter.[3]

In personal journal entries in early June 1995, Pinkston discussed her frustration with the court proceedings and her belief that the presiding judge in the upcoming June 19, 1995 hearing had turned against her.[4] In an undated document prepared at some point after May 25, 1995 and before June 18, 1995, Pinkston outlined possible options as follows:

> Option No. 1 is to do nothing, to let the courts place us in danger and have Kaitlyn scarred emotionally and probably physically abused, to willingly give her to someone who does not have her best interests at heart and who is now using her as a vehicle to further continue this very sick relationship.
>
> Option No. 2 is to run away, to go underground, but if I'm located, I will be sent to prison for child stealing, and Greg will be given Kaitlyn permanently.

---

[2] *See, e.g.*, exh. 40, at 49-78 (Pinkston's trial testimony providing her account of the early part of the relationship). While the term "roommate" commonly used in this context also was used at trial, the lodger in this instance was to reside in another part of the house rather than the same room. Pinkston would have been approximately 40 years old in 1992. *See* exh. 40, at 39-40.

Much of the trial evidence pertained to the multiple domestic judicial proceedings and the charges and counter charges made by both sides therein, as it bore upon the contested issue of Pinkston's state of mind at the time that she shot Payne. The evidence, in a sense, echoed the "he-said, she-said" disputes from the domestic judicial proceedings, with Payne of course no longer being alive to speak for himself. The State sought to portray Pinkston as an obsessed, controlling, and manipulative figure reminiscent of the Glenn Close character in the movie "Fatal Attraction" who lied to the courts and others in an effort to get what she wanted, as to which she herself often was conflicted in her own mind. The defense sought to portray Pinkston instead as the victim of a physically and verbally abusive Payne who posed a threat of death or serious physical harm to Pinkston, their daughter, and her mother and also, allegedly, presented a threat of sexual abuse to their daughter.

The Court does not seek to diminish the significance of such evidence in the brief summary set forth herein. The Court has not extensively catalogued the back and forth of the domestic dispute evidence because the bottom line remains that the jury was presented with two dramatically different pictures of the circumstances that preceded the shooting as they related to Pinkston's state of mind at the time.

[3] *E.g.*, exh. 35, at 272-274.

[4] *See, e.g.*, Exh. 44, at 154 (State's recital of journal entries in closing argument).

No. 3 is to commit suicide, but Kaitlyn will be given to Greg permanently.

And Option No. 4 is to kill Greg.

Exh. 35, at 163-64, 221-24, & 230-31.

Pinkston maintained at trial -- through her own testimony and in part through that of a nursing student counselor that she saw at the time – that this "options memo" was merely a self-counseling "problem solving exercise" where all alternatives, no matter how unrealistic, were written down.  Pinkston had a bachelors in sociology, and at the time she was in a master's program for sociology at UNLV.  She testified that she had been writing personal journals every year of her life since she was thirteen years old.  Pinkston maintained that the option stated as to killing Payne did not reflect something that she actually intended to do and that each one of the options discussed was "absolutely impossible."[5]

At some point after 12:30 p.m. on the afternoon of the shooting, Pinkston went to a notarial service and had a guardianship document notarized.  The document stated that it was Pinkston's desire to have her daughter remain in the custody and care of Pinkston's mother in the event of Pinkston's death "or under any unfortunate circumstance which would prevent me from taking care of" her daughter herself.[6]

Pinkston maintained at trial that she had the guardianship document notarized because she was afraid that Payne was about to kill her, following an alleged threat by Payne on the Friday night before Father's Day.  She testified that she planned to file the guardianship document at the court proceeding the next day on Monday.  According to Pinkston, she stopped at a copy store and made copies of the notarized document,

---

[5] Exh. 38, at 7-11 & 14-16 (Consuella Freeman); *id.*, Exh. 40, at 39-40 & 167-73 (Pinkston); *id.,* Exh. 41, at 4-6 (same).

[6] Exh. 35, at 45-67 (notary); *id.*, at 157-60 (detective).

4

returned home and put one copy in her notebook, and then put the original and three copies in an envelope in preparation for filing the document the next day while at court.[7]

On the afternoon of the shooting, Pinkston showed up at a facility called the Discovery Zone where Payne was having a supervised visitation of their then nineteen-month old daughter with Pinkston's mother present. Pinkston herself was not supposed to be present.

Thomas Page testified as follows in regard to what he observed while taking two cigarette breaks outside the Discovery Zone. He saw Pinkston initially approach on foot from what he perceived to be the direction of the parking lot for a neighboring business, Mountasia. About 30 to 45 minutes later, he heard and saw Pinkston and Payne arguing outside the facility. While he was not trying to listen to their heated conversation, and heard only "bits and pieces," he heard references to protective orders and the fact that neither was supposed to be near the other. Page did not hear Payne make any threats toward Pinkston. Page did not see Payne make any combative or assaultive physical gestures toward her. Page, again, did not hear every exchange between the two.[8]

Jack Wilkins walked out to and from his vehicle briefly during the time that Pinkston and Payne were arguing. Wilkins observed Pinkston standing over Payne who was sitting on the curb with his head down, fidgeting with grass or gravel on the ground. Wilkins perceived Pinkston to be acting aggressively and that Payne was not. Wilkins heard Payne say at one point: "That's why your father blew his f—ing head off." Pinkston responded: "Come on, you know," with the intonation of "Give me a break."

---

[7] Exh. 40, at 173-75, 182 & 183-88 (Pinkston).

[8] Exh. 33, at 50-60, 70-71, 81-87 & 90-92; cf. *id.*, at 91 ("I was not trying to hear it.").

Wilkins did not hear the specifics of any other part of the argument during the brief interval that he was within earshot.[9]

Eventually, Thomas Page heard Payne state to Pinkston "something to the effect of, 'I'm out of here. I'm leaving. You shouldn't be here.'" Payne walked toward his truck, and Page testified that it "appeared the he was putting his keys in his truck to leave."[10]

Pinkston testified that she thought Payne was going to his truck for a gun that she maintained that he kept under the seat. According to Pinkston, Payne kept trying during their discussion that day to get her to meet with him at a park in a remote area that she had been to the day before with her mother and daughter. Pinkston testified that Payne said to her immediately before walking toward the truck for her to "stand right there," that she was dead, and that he was going "to blow [her] f___ing head off." She testified that she believed that he was going to follow through on multiple threats allegedly made to her starting in late October 1994.[11]

Thomas Page saw Pinkston walk quickly up to about six to eight feet behind Payne, pull a gun, assume a stance with her feet shoulder width apart, and fire. Payne

---

[9] Exh. 33, at 151-81.

[10] Exh. 33, at 60-62.

[11] *See* exh. 40, at 205-24 (day of incident); *id.*, at 134-45, 160-62 & 173 (detailing prior alleged threats).

A Pinkston coworker, Robert Schmidt, testified for the defense that Payne said to him on the phone in late December 1994, when Schmidt was being evasive as to Pinkston's whereabouts or availability: "Well, you just tell her next time you see her, she can run but she can't hide." Exh. 37, at 106-07.

A Pinkston neighbor, Mary Marineau, testified for the defense that she observed an incident shortly before Christmas Eve, 1994, where a man arguing with Pinkston shouted at Pinkston in the driveway of her residence: "You can't run far enough, bitch," and "You're dead meat, and so is that brat of yours." According to Marineau, Pinkston drove away, and the man went to his pickup truck, retrieved a handgun, and then tried to drive after Pinkston while handling the steering wheel with the gun in hand. Marineau identified Payne at trial as the man that she saw from a photograph presented to her by defense counsel. Marineau testified that she did not report the incident to the police at the time because she did not get a license number. Exh. 38, at 86-100.

dropped or collapsed "like a sack of potatoes" after the shot. Page ran inside the Discovery Zone to tell someone to call 911 after the shot.[12]

At one point after Thomas Page came back outside, he made eye contact with Pinkston, who was walking away, at which point she accelerated her pace back toward the neighboring business, Mountasia.[13]

John Egbert testified as follows. He was working at Mountasia disposing of waste in the dumpster enclosure in the rear. He heard a loud noise like a gunshot or a tire blowout. He stepped outside the enclosure, looked around, and then returned inside to continue his task. About ten seconds after the first noise, he heard a second noise, and it became clearer that the two noises sounded like gunshots. About twenty seconds later, he stepped out of the enclosure again and observed a woman moving at a jog from the Discovery Zone toward the front of Mountasia.[14]

Pinkston testified that as Payne walked toward his truck she was terrified. According to Pinkston, there was a very loud noise in her ears, and she felt "like pushing on my face." She testified that she got the gun out of her purse but that she did not mean to pull the trigger. According to Pinkston, after the first shot, Payne "just stood there" and turned away from the truck door, and she thought that the shot had missed. She testified that she heard the second shot but did not remember when she fired it.[15]

The apparent first shot hit Payne in the right back. The bullet traveled through his right lung, passed through the aorta, traveled through his left lung, and then exited his left chest before penetrating the driver's side window of his truck, possibly hitting

---

[12] Exh. 33, at 62-67, 72-81 & 94-103. Defense counsel maintained in closing argument that the surveillance video tended to establish that Page initially heard rather than saw the first shot. Exh. 44, at 82-86. Be that as it may, Page testified, including on cross-examination, that he saw rather than merely heard the first shot and that he then saw Payne drop immediately "like a rock" or "like a sack of potatoes."

[13] Exh. 33, at 65-68 & 87-103.

[14]  Exh. 33, at 134-150.

[15] Exh. 40, at 224-26.

7

and denting the painted headliner and coming to rest on the seat cushion on the passenger side. The apparent second shot entered through Payne's right cheek near the ear, passed through a number of nonvital tissues, exited on the back of his left neck, reentered his body in his upper left shoulder or back, and came to rest under the skin in his left back.[16]

A lay witness who tried, unsuccessfully, to find a pulse before the police and medical responders arrived observed Payne laying on the ground with the left side of his face on the ground and the right side of his face up. The first responding fire rescue crew similarly found Payne, with no respiration, pulse or cardiac activity, laying with the left side of his face on the ground. The lividity, or blood pooling, and pattern of final blood flow from the wounds observed during the autopsy additionally tended to establish that Payne was laying on his back when he died.[17]

The medical examiner opined that Payne was standing either next to his truck or fairly close to it when the apparent first bullet struck him, and he fell backwards. The examiner opined that the trajectory of the apparent second shot was consistent with Payne then being shot while he was laying on the ground, with the left side of his head turned toward the ground. The medical examiner acknowledged that this was not the only possible scenario as to Payne's position at the time of the second shot, but his conclusion based upon the physical evidence was that Payne was on his back when the second shot hit him. The defense expert opined that this scenario as to the second shot was only one of many possible scenarios reflected by the forensic evidence.[18]

---

[16] Exh. 35, at 79-85 & 101 (medical examiner); *id.*, exh. 36, at 91, 148 & 152-53 (crime scene technicians); *id.*, at 213 & 218-19 (firearm and tool mark examiner); exh. 38, at 56-57 & 75-76 (defense crime scene reconstruction expert). As testified to by the medical examiner, the aorta is the very large artery through which the blood going to the rest of the body passes through after exiting the heart.

[17] Exh. 34, at 11-37 (John Barr, who testified at one point that the right side of the face was to the ground, but this testimony was corrected thereafter); *id.*, at 147-58 (fire rescue); *id.*, exh. 35, at 87-89 (medical examiner).

[18] Exh. 35, at 100-02 & 110-15 (medical examiner); Exh. 38, at 65-71 & 78-85 (defense crime scene reconstruction expert).

The State's evidence tended to establish that the apparent first shot killed Payne almost immediately, within a span of approximately twenty to thirty seconds, by penetrating the aorta. The apparent second shot did not pass through any vital structures, such as a major blood vessel or the spinal cord, before exiting the back of the neck and passing through similarly nonvital tissue in Payne's back.[19]

A third unfired and ejected cartridge that matched the two fired rounds also was found at the scene. The tool markings on the ejected cartridge established conclusively only that the round had been loaded into and then cycled through the semiautomatic pistol (i.e., chambered and then extracted from the firing chamber) at some point without being fired. The markings were not inconsistent with the round having jammed during an unsuccessful firing attempt and having been cleared, but the markings did not conclusively establish that the round had jammed. The markings also were consistent with the cartridge simply having been loaded and then cycled through the pistol normally without firing. The markings thus also were not inconsistent with a person pulling the slide back and chambering a round when a cartridge already was in the firing chamber, which would result in the previously-chambered round being ejected without being fired. Neither the State nor the defense expert could opine as to whether the unfired cartridge was ejected before, between, or after the two shots that were fired.[20]

At 4:24 p.m. on June 18, 1995, Pinkston left a message on her home answering machine for her infant daughter. Pinkston said, inter alia: "I didn't know what else to do."[21]

---

[19] Exh. 35, at 81-82, 91, 105 & 110 (medical examiner). The defense crime scene reconstruction expert stated variously that he would defer to the medical examiner as to whether the second shot could have been fatal, that he did not have a position on that issue, and that he "would assume" that the second shot "certainly would have that capability as well." Regardless of this qualified assumption, the defense expert was neither tendered nor qualified as an expert in forensic pathology. Exh. 38, at 74-75.

[20] Exh. 36, at 130-33 & 145-48 (crime scene technician); *id.*, at 211-12, 222-25 & 227-35 (firearm and tool mark examiner); exh. 38, at 58-61, 76-77 & 81-82 (defense crime scene reconstruction expert).

[21] Exh. 35, at 200-03.

At approximately 5:00 p.m., Pinkston turned herself in at a police station in downtown Las Vegas. She responded affirmatively that she had committed a crime of violence and that the victim was at the Discovery Zone. She informed the desk sergeant that the weapon was in the trunk of her car. When her vehicle was later impounded and searched, the .380 handgun and a seven-round magazine holding four live rounds was found in a purse in the trunk of the vehicle. As of that time, there was nothing else in the purse other than the handgun and magazine. The hard gun case for the handgun was in a brown paper bag in the trunk.[22]

When interviewed shortly thereafter by detectives, Pinkston stated, after learning that Payne had died, that she had shot Payne twice. According to the interviewing detective, she said that "she didn't think she knew what she was doing when she fired the first shot, but she did when she fired the second shot." She stated that "she did not know what was going on in her mind." According to the detective's testimony on direct examination, Pinkston did not state to the detectives at that time that she was in fear for her life, that Payne had threatened her prior to the shooting, that she believed that Payne had a gun, or that she fired to protect herself. According to the detective, Pinkston instead said that "she did not know what was going to happen when he got to the truck."[23]

However, when defense counsel went back through the transcript of the statement with the detective on cross-examination, there were numerous exchanges, including key exchanges presented as unequivocal statements on direct, where Pinkston did not complete sentences and/or her voice trailed off as she broke down.

[22] Exh. 33, at 119-34 (desk sergeant); *id.*, exh. 35, at 131-36 (detective); *id.*, exh. 36, at 94-95 & 136-42 (crime scene technicians); *id.*, at 194-95 (firearm and tool mark examiner); exh. 42, at 96-97 & 172-72 (detectives).

[23] Exh. 42, at 85-95 & 114-15 (detective).

The detective testified that Pinkston appeared upset and was crying "on and off" throughout the interview, with the detective stating to Pinkston at the time that she was "acting devastated." When defense counsel went back through the transcript, Pinkston's statements were not necessarily as unequivocal as the detective's testimony on direct indicated. Pinkston specifically stated: "I just felt, I did have a gun with me, and I just felt if he had gotten in that car that he was, that would be the end of me."[24]

The police did not find a gun in Payne's truck following the shooting. When the crime scene technicians continued processing the scene after examining and photographing Payne's body, both doors to the truck were locked and the keys were on the ground next to Payne's body. The driver's side window was broken apparently from a gunshot.[25]

Nor did the police find a gun when they searched Payne's residence two days later. Las Vegas police records did not show that a gun was registered to Payne. A local ordinance requires handgun owners to register their weapons with the local police.[26] The State called a number of landlords, employers and/or friends who testified that they had not seen Payne with a gun and/or had not heard him speak of having a gun.[27]

When the police executed a search warrant of Pinkston's residence, her mother unilaterally directed the police to a three-ring binder. The binder included materials

---

[24] Exh. 42, at 98-114 & 115-17 (detective).

[25] Exh. 36, at 90-92 & 135-36.

[26] Exh. 35, at 121 (search of Payne residence); exh. 42, at 130-31 (absence of entry in local firearm registration records). Pinkston had not registered her handgun following her return to Las Vegas after purchasing the gun while living in Carson City in March 1995. She testified that she was not aware of the Clark County local registration requirement. Exh. 33, at 104-18 (Pinkston's gun purchase in Carson City); *id.*, Ex. 35, at 182-86 (materials associated with Pinkston's handgun found at her residence).

[27] Exh. 42, at 125 (Helen Redford); *id.*, at 136-38 (James Schollard, who testified specifically about what he saw in Payne's truck); *id.*, at 151 (Jacques Jasmin); *id.*, at 155 (Lee Bennett).

11

pertaining to the domestic dispute litigation between Pinkston and Payne. The first page in the binder was dated June 16, 1995, and stated, inter alia:

> To mom, my attorney or whoever has possession of this book. . . . .

> You may use any contents in my defense or in my behalf . . . .

Exh. 35, at 152-55 & 215-16.

Pinkston maintained that the cover page to the binder had been there continuously prior to June 1995 and that the binder contained "all the family court papers." She testified that she had updated the cover page with a June 16, 1995, date because the prior cover page had worn out.[28]

The binder included, inter alia, the guardianship document that Pinkston had notarized on June 18, 1995.[29]

The police also found a spiral bound notebook that included the "options" memo in which Pinkston discussed various options.[30]

At trial, the state district court instructed the jury, inter alia, as follows:

> Murder of the first degree is murder which is perpetrated by any kind of willful, deliberate, and premeditated killing of another human being.

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.

> The law does not undertake to measure in units of time the length of the period during which premeditation is formed. It may be as instantaneous as successive thoughts of the mind. The test is not the duration of time, but rather the actual formation of premeditation. If the State proves beyond a reasonable doubt that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

Exh. 47, Instruction Nos. 7 and 8.

---

[28] Exh. 40, at 175-79.

[29] Exh. 35, at 155-59.

[30] Exh. 35, at 161-65.

The trial court rejected a proposed defense instruction that instead would have charged the jury as follows:

> Premeditation is a design -- a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed [course] of action.
>
> The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.
>
> The true test is not the duration of the time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

Exh. 45, at 7.

During closing argument, the State relied upon evidence, such as the options memo, that the prosecution maintained established that Pinkston planned to murder Payne and went to the Discovery Zone specifically to carry out this purpose.

The State further argued, however, pursuant to Jury Instruction No. 8, that Pinkston would be guilty of first-degree murder even if she had formed an intent to kill Payne instantaneously. The prosecutor argued:

> Some lay persons come to court with the notion that premeditation requires extensive planning. Judge Leavitt clarifies this issue. He continues in Instruction No. 8, the law does not undertake to measure in units of time the length of the period during which premeditation is formed. It may be as instantaneous as successive thoughts of the mind.
>
> I'd like to give you an example. I'm sure we've all been in this situation. . . . . We're going 45 miles an hour in a 35 zone, and we are confronted with a yellow light and you need to decide, do you go through the light or do you stop? But what happens? The first thing you do is look down at your speedometer. How fast am I speeding now? Do I speed up

even more? You look around. Any cops here? You look in your rear-view mirror. Is there a big semi behind me? If I slam on my brakes, am I going to be in an accident?

That total thought process is done within a second. That is sufficient for premeditation. . . . .

Exh. 44, at 40-41.

The prosecutor accordingly likened the amount of prior intention required to convict for first-degree murder to the literally split-second decision to speed through an intersection against a yellow light.

In the rebuttal argument, the State again relied upon evidence that it maintained established preplanning. The prosecutor reiterated, however, four paragraphs from the end of the argument:

. . . . Premeditation and deliberation need not be for a day, an hour, or even a second. It can be as instantaneous as successive thoughts in the mind. . . . .

Exh. 44, at 162.

On September 19, 1997, a jury convicted Pinkston of first-degree murder with a deadly weapon.[31] A separate penalty hearing was then held before a jury, and Pinkston was sentenced to life in prison with the possibility of parole, with a consecutive term of life with the possibility of parole for the deadly weapon enhancement. Judgment of conviction was entered on November 7, 1997.[32]

The Nevada Supreme Court dismissed Pinkston's direct appeal on March 2, 2000. The state district court conducted an evidentiary hearing on Pinkston's state postconviction habeas corpus petition and ultimately denied the petition. On June 27, 2007, the Nevada Supreme Court affirmed the denial of the state postconviction petition.[33]

---

[31] Exh. 49.

[32] Exhs. 52, 55.

[33] Exhs. 62, 82, 93, 101.

14

Pinkston filed her federal habeas petition September 26, 2007 (ECF No. 1). This court appointed the Federal Public Defender as counsel for Pinkston (ECF No. 6).

Ultimately, as discussed, this court granted a conditional writ of habeas relief on ground 3 -- an ineffective assistance of counsel claim—which the Ninth Circuit reversed and remanded in light of its decision several days earlier in *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013) (*see* ECF Nos. 42, 67).

As explained, Pinkston's second-amended petition contains the nine grounds from her first amended petition (ECF No. 69). It adds ground 10, in which she contends that the Nevada Supreme Court violated her Fifth and Fourteenth Amendment due process rights when it failed to apply the rule announced in *Byford v. State*, 994 P.2d 700, 712 (Nev. 2000) to her case because *Byford* narrowed the scope of conduct that could be defined as premeditated murder before Pinkston's conviction became final. *Id.* at 45-47.

Pinkston returned to state court and filed a counseled, state postconviction petition raising ground 10, and this court granted a stay and abeyance (ECF No. 81). The Nevada Supreme Court affirmed the denial of the second postconviction petition.[34] This court granted Pinkston's motion to reopen this action (ECF No. 84). Respondents have now answered all grounds that remain before the court, and Pinkston has replied (ECF Nos. 35, 40, 96, 98).

## II. Antiterrorism and Effective Death Penalty Act

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with

---

[34] Exh. 136.

15

respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court

16

identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### III.    Instant Petition

#### a.  Ground 10

Pinkston claims that the Nevada Supreme Court violated her Fifth and Fourteenth Amendment due process rights when it failed to apply the rule announced in *Byford* to

her because it narrowed the scope of conduct that could be defined as premeditated murder before Pinkston's conviction became final on June 19, 2000 (ECF No. 69, pp. 45-47). Respondents argue that ground 10 is procedurally barred, untimely, and fails on the merits (ECF No. 96, pp. 13-17). As discussed below, ground 10 is denied on the merits.

In *Byford v. State*, 994 P.2d 700, 713 (Nev. 2000), the Supreme Court of Nevada concluded that the "*Kazalyn* instruction," which was used in Nevada courts between 1992 and 2000, "blur[red] the distinction between first- and second-degree murder" by not sufficiently distinguishing between the distinct elements of deliberation and premeditation.

In *Bunkley v. Florida*, the United States Supreme Court held that a change in state law must be applied retroactively in order to satisfy due process. 538 U.S. 835 (2003).

In *Nika v. State*, the Supreme Court of Nevada held that *Byford* announced a change in state law that applies to cases that were not final when *Byford* was decided. 198 P.3d 839, 848-850 (Nev. 2008).

In *Babb. v. Lozowsky*, the Ninth Circuit concluded that the failure to apply the new *Byford* instruction in cases that were not final when *Byford* was decided was an unreasonable application of clearly established federal law. 719 F.3d 1019, 1032-1033 (9th Cir. 2003); 28 U.S.C. §2254 (d)(1).

In *White v. Woodall*, the Supreme Court held that federal courts may extend Supreme Court rulings to new sets of facts on habeas review only if it is "beyond doubt" that the ruling applies to a new set of facts. The Court explained that it is beyond doubt that a ruling applies to a new set of facts only if there can be no "fairminded disagreement" on the question. 572 U.S. 415 (2014).

In *Moore v. Helling*, 763 F.3d 1011, 1021 (9th Cir. 2014), the Ninth Circuit determined that *White v. Woodall* effectively overruled *Babb. v. Lozowsky*, 719 F.3d

18

1019, 1032-1033 (9th Cir. 2013), and held that, at least before *Bunkley v. Florida* was decided in 2003, it was not an unreasonable application of clearly established federal law not to apply *Byford* to convictions that were not final at the time that *Byford* was decided.

The Nevada Supreme Court affirmed Pinkston's conviction in March 2000.[35] Her conviction became final when the time for seeking a writ of certiorari from the United States Supreme Court expired on June 19, 2000 (ECF No. 69, p. 47; *Nika v. State*, 198 P.3d 839, 848 n.52 (Nev. 2008)). In light of *Moore*, Pinkston cannot demonstrate that the Nevada Supreme Court's decision on federal ground 10 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, federal habeas relief is denied as to ground 10.

### b. Claims Raised on Direct Appeal

#### i. Ground 1

Pinkston contends that the trial court committed reversible error in sending unplayed videotape exhibits into jury deliberations in violation of her Fifth, Sixth, and Fourteenth Amendment rights to confront witnesses (ECF No. 69, pp. 10-11).

The trial court admitted 4 videotapes of family court proceedings involving Pinkston and Payne.[36] Defense counsel objected to the admission of 1 of the 4 tapes on the basis that it was duplicative because the transcripts were already in evidence. *Id.* The transcripts for all 4 hearings had been admitted without defense objection.[37] After the

---

[35] Exh. 62.

[36] Exh. 42, at 141-42.

[37] *See* exh. 61, at 7.

court overruled the objection, the State informed the court that the they were not going to show the tapes to the jury at that time. Defense counsel did not comment.[38]

During closing arguments, the prosecutor referred to exhibit 107, the unplayed tape of a May 4, 1994 family court hearing:

> And you'll see at the end of the tape on May 4th, the second time she drug him into court, this time for going over to Jerry Sapp's house saying, Jerry, this woman is crazy. She's accusing me of things.

> Back in court May 4, 1994, and Judge Marren listens to Greg's side of it, and he says she's supposed to be terrified of me? Well, here, Judge. Here's this letter in February that she tucked under the windshield of my truck asking me to meet her at 3:30 in the morning. She's terrified of me, but she wants to meet me at 3:30 in the morning?

> And Judge Marren turns to her and says, Is this your letter? Did you write this?

> And she says, Yes.

> And Judge Marren says, You know, you really need to stop giving him mixed signals. Now that is the phrase that the judge applied to her. And she has twisted that to say it's in the other way around. That's in the transcript. That's in the tape that I put in front of you.

Exh. 44, pp. 149-50.

The prosecutor's argument continued to refer to these unplayed tapes, later referencing exhibit 108, the tape of the August 2, 1994 family court hearing:

> She tried to get him numerous times to relinquish his parental rights, and in front of Judge Jones. I put that evidence before you, ladies and gentlemen. And you can watch the tape if you want, and you can listen to Judge Jones ask Greg Payne on August 2, 1994, "I don't understand. Why do you want to terminate parental rights?"

> And his answer is "Because she keeps bringing me to court, and I can prove these are wrong, but it's never going to end. And she said she'll still let me see the kid."

---

[38] Exh. 42, at 141-42.

And Judge Jones says to him, "But do you understand that this is the death penalty or (sic) parental rights? If you give up your parental rights, you won't have any more right to your child than anyone in the courtroom." You can see him on the tape tell Greg that.

He never wanted to give up his parental rights. He wanted to get away from her. Like he was trying to get away from her the day she shot him in the back.

*Id.* at 146-47.

The prosecutor continued, referencing exhibit 109, another unplayed videotape of the March 27, 1995 family court hearing, arguing:

She tells the judge in March 27th when Mary has to bring her into court for an order to show cause because she's in contempt of court because she has not complied with the order, and she has one excuse after another, and you'll see on the tape, if you care to watch it or look at the transcript, you'll see this is a cowardly woman? She is a defiant woman.

* * *

June 4th, her Day Runner. She reviewed the hearing tape of the March 27th hearing before Judge Gaston and concludes Judge Gaston is prejudiced against me.

*Id.* at 153-54.

The Nevada Supreme Court summarily dismissed this claim as lacking merit. Exh. 62.

Pinkston argues that the Ninth Circuit has held that allowing jurors to listen, without any guidance or instruction, to tapes that have never been played in open court is a structural error requiring automatic reversal (ECF No. 40, pp. 11-15, citing *United States v. Noushfar*, 78 F.3d 1442, 1554 (9th Cir. 1996)). In *Noushfar*, undercover agents had recorded many potentially incriminating conversations with the defendants. 78 F.3d at 1444. Over strenuous objection, the district court permitted the jury to take 14 tapes to the jury room that had not been played in the courtroom. The jurors requested and were given a tape recorder. They were given no instructions about the tapes. The Ninth Circuit concluded that this violated Federal Rule of Criminal Procedure 43 and possibly violated the Confrontation Clause. *Id.* at 1444-1445.

First, it is unclear that sending the unplayed videotapes, which had been admitted into evidence, into the jury room implicates federal constitutional principles (*see* ECF No. 35, p. 18; ECF No. 40, p. 14). Second, Pinkston's situation differs from *Noushfar*. The jury had transcripts of the videotapes of the family court hearings. Further, both sides questioned Mary Groesbeck, Payne's family court lawyer, at length about those hearings, basically taking her through the hearing transcripts.[39] Those transcripts had been admitted.[40] The videotapes in Pinkston's case were of family-court proceedings that pre-dated Payne's killing by months to years. While the videotapes were intended to discredit Pinkston's testimony the she feared an angry and violent Payne, there was substantial other evidence to support the first-degree murder verdict. Finally, nothing in the record indicates that the jury had the means to view the tapes (*see* ECF No. 35, pp. 17-18; ECF No. 40, pp. 12).

The court therefore concludes that Pinkston has not demonstrated that the Nevada Supreme Court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d). Pinkston is not entitled to federal habeas relief on ground 1.

### ii. Ground 4

Pinkston asserts that the trial court erred by refusing to give a jury instruction that properly defined "implied malice" in violation of her Fifth and Fourteenth Amendment rights (ECF No. 69, p. 16).

The jury was instructed:

> Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.

---

[39] Exh. 35, at 232-74; exh. 36, at 15-79.

[40] *See* exh. 42, at 142.

> Malice shall be implied when no considerable provocation appears or when all the circumstances show an abandoned and malignant heart.

Exh. 47, Instruction No. 5.

Defense counsel filed objections to this proposed instruction as well as to an instruction on reasonable doubt.[41] The defense had proffered this alternative:

> Express malice is that deliberate intention to unlawfully take away the life of a fellow creature, which is manifested by external circumstances capable of proof.
>
> Implied malice may be found when:

1. The killing resulted from an intentional act,

2. The natural consequences of the act are dangerous to human life, and

3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

> When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.

Exh. 45, pp. 1-2.

The Nevada Supreme Court summarily denied this claim on direct appeal.[42]

Pinkston argues here that prescribing when malice "shall be implied" appears to impose an impermissible mandatory presumption (ECF No. 15, p. 12). Respondents contend that this instruction is definitional and does not direct the jury to presume anything.

This court concludes that there is no error in this jury instruction and that it merely defines express and implied malice. Moreover, even assuming, *arguendo*, that the trial court erred in giving this instruction, Pinkston has not shown that the jury would likely have returned a different result. Notably, the distinction—as laid out in the jury

---

[41] Exh. 46.

[42] Exh. 62, at 4.

instructions—between first-degree and second-degree murder is whether the State proved premeditation and deliberation. The distinction does not turn on whether the State proved malice; malice aforethought is an element of both first and second-degree murder. *See* jury instruction nos. 7, 8, 10.

Pinkston has not demonstrated that the Nevada Supreme Court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. See 28 U.S.C. § 2254(d). Accordingly, Pinkston is not entitled to federal habeas relief on ground 4.

### c. Ineffective Assistance of Counsel (IAC) Claims

Ineffective assistance of counsel claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000) (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.*

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured

24

against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at ——, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at ——, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within

25

the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

### i. **Ground 8(A)**

In ground 8(A) Pinkston alleges that trial counsel was ineffective for calling deputy district attorney Bill Berrett as a defense witness (ECF No. 69, pp. 25-29). Berrett testified that he screened the January 1995 case in which Pinkston alleged that Payne was stalking her and had threatened her life. After he requested and received additional information from Pinkston, he approved the case, it was filed in April 1995, and a judge issued an arrest warrant for Payne. The case was closed in July 1995 after Payne was killed. On cross-examination, the State elicited testimony that Berrett supervised the lawyers that prosecuted Pinkston in this murder case.[43]

The Nevada Supreme Court rejected this claim, stating that, even assuming that counsel was deficient in calling Berrett, in light of the substantial evidence supporting the conviction, Pinkston did not show a reasonable probability of a different outcome had counsel not called Berrett.

> In particular, we note that the jury heard testimony that Pinkston stayed in touch with Payne after obtaining protective orders against him and that Pinkston shot Payne in the back as he was trying to leave and shot him in the head seconds later. Further, Pinkston admitted she knew what she was doing when she fired the second shot. The jury also heard testimony that Payne was not acting in a threatening manner before Pinkston shot him.

Exh. 101, at 4-5.

Pinkston has failed to demonstrate that the Nevada Supreme Court's decision was contrary to or involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence presented in the state

---

[43] Exh. 37, at 123-67.

court proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 8(A).

ii. **Ground 8(B)**

In ground 8(B) Pinkston asserts that counsel was ineffective for failing to make sure that Pinkston was present at a critical in-chambers meeting (ECF No. 69, pp. at 29-30). Right before defense counsel was to cross-examine State's witness Mary Groesbeck (Payne's family court lawyer), counsel for both sides as well as Groesbeck met with the judge in chambers. The State made an oral motion in limine to preclude the defense from examining Groesbeck about an article that had appeared in that morning's Las Vegas Review Journal. The State explained that the article stated that the Nevada Supreme Court had entered an order directing Groesbeck to respond to certain complaints by clients regarding client communication. Defense counsel strenuously objected that she should be able to question Groesbeck about the complaints in order to impeach her credibility. The court granted the motion, reasoning that the client complaints that were the subject of the newspaper article were not relevant to her communications with Payne. The court directed that the defense would not refer to anything that had appeared in the newspaper that day.[44]

The Nevada Supreme Court affirmed the denial of this claim in Pinkston's first state postconviction petition:

> Pinkston, whose counsel told her she could not be present for the hearing, claims she had seen a news story the night before the in-chambers meeting that contradicted some of Groesbeck's testimony on direct examination. In her brief, Pinkston says she informed her counsel about the story, and counsel were therefore aware of the substance of the potential issue. Pinkston failed to explain how her absence thwarted a just and fair hearing or how the outcome of her trial would have been different had she been present for the in-chambers meeting, and the district court did not therefore err by rejecting this claim.

Exh. 101, pp. 5-6.

---
[44] Exh. 36, at 5-9.

27

Pinkston has failed to demonstrate that the Nevada Supreme Court's decision was contrary to or involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Ground 8(B) is, therefore, denied.

### iii. **Grounds 8(C)(1) and 9(C)(1)**

Pinkston asserts in ground 8(C)(1) that counsel was ineffective for failing to fully object to the admission of Danny Whitaker's, Pinkston's ex-husband, testimony regarding specific acts of misconduct (ECF No. 69, pp. 30-32). In ground 9(C)(1) she argues that appellate counsel was ineffective for failing to raise the issue (*id.* at 44).

The court permitted Whitaker to testify as to Pinkston's character. He testified that about 16 years before Payne was killed, he was married to Pinkston for about 2 months and that he knew her to be an intelligent, manipulative, violent, very aggressive, and dominating individual.[45] He stated that Pinkston lied to him about her credit history and about how many times she had previously been married. He testified that Pinkston told him she had had five abortions and was no longer fertile. At one time she thought she was pregnant and went to multiple hospitals to confirm it, but it was "some kind of psychological thing in her head."[46] He said during one argument Pinkston began swinging at him with her fists and beating on his chest, bit him drawing blood, and threw a phone at him, which hit him in the back of the head.

Though it rejected the claim, the Nevada Supreme Court agreed that some of Whitaker's testimony was improperly admitted:

> [He[ testified that Pinkston was manipulative, violent, and a liar. Whitaker also testified about several specific instances when Pinkston lied to him and assaulted him during their brief marriage 16 years before trial. . . .

---

[45] Exh. 42, at 49-66.

[46] *Id.* at 53.

28

> We agree with Pinkston that some of this testimony was improper. Because Pinkston testified, Whitaker could properly state his opinion that she was untruthful. However, he could not testify on direct examination as to specific acts of untruthfulness. Pinkston did not, by claiming self-defense or otherwise, place the violence of her own character at issue; Whitaker could not therefore testify about that character trait or specific instances of Pinkston being violent.
>
> However, we conclude that admission of the evidence was harmless error. There was substantial evidence supporting the first-degree murder conviction without Whitaker's testimony, as detailed [earlier in the order].

Exh. 101, pp. 6-7.

This court agrees that this testimony regarding specific acts was improper. However, in light of the significant evidence supporting the verdict, Pinkston has failed to demonstrate that the Nevada Supreme Court's decisions on the trial and appellate IAC claims were contrary to or involved an unreasonable application of *Strickland* or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to grounds 8(C)(1) and 9(C)(1).

### iv. **Grounds 8(C)(2) and 9(C)(2)**

In ground 8(C)(2) Pinkston contends her counsel was ineffective for failing to fully object to the trial court's ruling that a waiver of the attorney-client privilege with respect to Doug Clark, Pinkston's family court lawyer, would act as a waiver of all prior attorney-client relationships and for failing to make an offer of proof as to what Clark would have testified (ECF No. 69, p. 32). In ground 9(C)(2) she argues that appellate counsel was ineffective for failing to raise the issue regarding the preclusion of Clark's testimony (ECF No. 69, pp. 44-45).

The defense intended to call Doug Clark in order to rebut Mary Groesbeck's testimony regarding the family court matters. However, the court informed the defense that if Pinkston waived the attorney-client privilege with respect to Clark that she waived

it as to any lawyer who represented her.  Defense then indicated to the court "you're

forcing us to take the waiver back."  Clark did not testify.[47]

The Nevada Supreme Court held that the trial court's ruling was:

> erroneous, however, because waiver of attorney-client privilege by
> allowing the attorney to disclose confidential communications only waives
> the privilege as to the subject matter of those communications.  Thus,
> even assuming a waiver as to one attorney could transfer to a previous
> attorney, a prospect of which we are not convinced under the
> circumstances present here, any statement by Clark about his
> communications with Pinkston would only have allowed the State to
> question other attorneys about their communications on the same subject
> matter.

> However, Pinkston has failed to demonstrate that the outcome of her
> trial might have been different had Clark testified.  We are also not
> convinced that appellate counsel was ineffective for failing to raise this
> claim.

Exh. 101, pp. 7-8.

 Eyewitness trial testimony stated that Payne was walking away from Pinkston

when she adopted a wide stance about 6-10 feet behind him, raised her loaded gun

(which was the only item in her purse), shot him in the back, he crumpled to the ground,

and she then approached him and shot him in the face.  It cannot be said that Pinkston

has shown a reasonable possibility of a different trial outcome if Clark had testified.

Pinkston has failed to demonstrate that the Nevada Supreme Court's decisions on

these trial and appellate IAC claims were contrary to or involved an unreasonable

application of *Strickland* or were based on an unreasonable determination of the facts in

light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Thus, grounds 8(C)(2) and 9(C)(2) are both denied.

### v. **Grounds 9(A) and 9(B)**

As ground 9(A) Pinkston asserts IAC of appellate counsel for failing to adequately

raise all issues as federal constitutional issues in state court (ECF No. 69, pp. 33-36).

---

[47] Exh. 40, at 19-24.

The Nevada Supreme Court affirmed the denial of this claim in Pinkston's state postconviction petition, concluding that she did not show a reasonable probability of success on appeal had the issues been federalized.[48]

In ground 9(B) she argues that her appellate counsel failed to adequately argue the propriety of the premeditation and deliberation instructions by failing to rebut a misstatement of the record (9(B)(1); failing to address the intent issues of first-degree murder (9(B)(2); and failing to seek rehearing after the decision in *Byford v. State* (9(B)(3) (ECF No. 69, pp. 36-43).

The Nevada Supreme Court affirmed the denial of these claims stating that it was well aware of *Byford*, which was briefed and argued en banc while Pinkston's appeal was pending before the court.[49] The state supreme court reasoned that the evidence supporting the first-degree murder charge was significant, that defense counsel adequately argued that the evidence did not indicate premeditation and deliberation, and that Pinkston failed to show a reasonable probability of a different outcome.

Pinkston has not shown that the Nevada Supreme Court's decisions on federal grounds 9(A) and 9(B) were contrary to or involved an unreasonable application of *Strickland* or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to grounds 9(A) and 9(B).

### d. Procedurally Defaulted Claims

Finally, the court turns to procedural bar and grounds 2, 5, and 6. "Procedural default" refers to the situation where a petitioner in fact presented a claim to the state courts but the state courts disposed of the claim on procedural grounds, instead of on the merits. A federal court will not review a claim for habeas corpus relief if the decision

---

[48] Exh. 101.

[49] Exh. 101, at 8-9.

31

of the state court regarding that claim rested on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 730-31 (1991).

The *Coleman* Court explained the effect of a procedural default:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750; *see also Murray v. Carrier*, 477 U.S. 478, 485 (1986). The procedural default doctrine ensures that the state's interest in correcting its own mistakes is respected in all federal habeas cases. *See Koerner v. Grigas*, 328 F.3d 1039, 1046 (9th Cir. 2003).

To demonstrate cause for a procedural default, the petitioner must be able to "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray*, 477 U.S. at 488 (emphasis added). For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

To demonstrate a fundamental miscarriage of justice, a petitioner must show the constitutional error complained of probably resulted in the conviction of an actually innocent person. *Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). This is a narrow exception, and it is reserved for extraordinary cases only. *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992). Bare allegations unsupplemented by evidence do not tend to establish actual innocence sufficient to overcome a procedural default. *Thomas v. Goldsmith*, 979 F.2d 746, 750 (9th Cir. 1992).

i. **Ground 2**

Pinkston contends that the trial court erred in failing to instruct the jury that malice aforethought is a necessary element of first-degree murder, in violation of her Fifth and Fourteenth Amendment due process rights (ECF No. 69, p. 12).

Pinkston failed to raise this claim as a federal constitutional violation on direct appeal. *See* exh. 58, pp. 27-28. This court previously concluded that the claim is technically exhausted and procedurally barred (*see* ECF No. 29, pp. 3-8; *see also* ECF No. 33). Pinkston would now have to show that ineffective assistance of appellate counsel provides cause and actual prejudice for failure to raise this claim as a federal constitutional violation. The Nevada Supreme Court expressly rejected the IAC claim in her state postconviction proceedings. The state supreme court reasoned:

> Pinkston unsuccessfully argued on direct appeal that the district court erred by failing to instruct the jury that malice was an element of first-degree murder. Pinkston cites several cases for the general proposition that the jury must be instructed on all the elements of a crime, but she fails to explain how appellate counsel's citation to these cases or to due process might have changed the outcome of her appeal.

Exh. 101, pp. 12-13.

The Nevada Supreme Court did consider the challenge to the jury instruction. As discussed above with respect to ground 4, the distinction between first-degree and second-degree murder turned on whether the State proved premeditation and deliberation, not whether the State proved malice. Malice aforethought is an element of both first and second-degree murder.[50]

Even under *de novo* review, Pinkston has not shown how the outcome of her appeal would have been different if her counsel had presented this claim as a federal constitutional violation. *See Jones v. Ryan*, 691 F.3d 1093, 1101 n.2 (9th Cir. 2012). Ground 2, therefore, is dismissed with prejudice as procedurally defaulted.

---

[50] *See* exh. 47, Instruction Nos. 7, 8, 10.

33

ii. **Ground 5**

Pinkston asserts that the trial court erred by prohibiting the introduction of impeachment evidence against the State's witness Mary Groesbeck, in violation of her Fifth and Fourteenth Amendment due process rights (ECF No. 69, pp. 17-19).

As discussed above, Groesbeck testified for the State about her representation of Payne in family court disputes between he and Pinkston.[51] The court granted the state's motion in limine and directed that the defense would not refer to anything that had appeared in the newspaper that day about certain complaints by clients of Groesbeck regarding client communication.[52]

On cross-examination, Groesbeck testified that Payne was found guilty of domestic violence stemming from an incident where he pushed Pinkston, and she alleged he broke her arm.[53] Defense counsel questioned Groesbeck at length about the different family court proceedings involving Pinkston and Payne. The documents related to those hearings, including several complaints, motions, and orders, were entered into evidence.

Pinkston failed to raise this claim as a federal constitutional violation in state court.[54] This court previously concluded that the claim is technically exhausted and procedurally barred (*see* ECF No. 29, pp. 13-14; *see also* ECF No. 33). Pinkston argues that she can demonstrate cause and prejudice based on ineffective assistance of appellate counsel for failure to raise this claim as a federal constitutional violation. The Nevada Supreme Court affirmed the denial of the IAC claim in her state postconviction proceedings. The Nevada Supreme Court explained:

---

[51] Exh. 35, at 51-95.

[52] Exh. 36, at 5-9.

[53] *Id.* at 16-80.

[54] *See* exh. 58, at 35-38.

34

Pinkston now argues that appellate counsel should have raised [a pending bar investigation into Groesbeck's alleged failure to communicate with her clients] as a violation of her Sixth Amendment rights. The Sixth Amendment allows the trial court broad discretion to allow cross-examination on the issue of bias; the trial court may properly exclude testimony that is only marginally relevant to the issue of bias. Improper restriction on the scope of such cross-examination is subject to harmless-error analysis. Pinkston fails to explain how we may have resolved this issue differently had appellate counsel argued this claim under the Sixth Amendment.

Exh. 101, pp. 11.

Pinkston has not shown cause and prejudice. Moreover, the claim lacks merit. Allegations that some of Groesbeck's clients had complaints about lack of communication would have shed little light on nor have any bearing on whether she testified credibly about the family-court proceedings at which she represented Payne. Further, transcripts and videotapes of the hearings had been admitted into evidence. In any event, ground 5 is dismissed as procedurally barred.

iii. **Ground 6**

Pinkston argues that the trial court erred by denying in part Pinkston's motion in limine, thereby allowing the introduction of improper impeachment evidence, in violation of her Fifth and Fourteenth Amendment due process rights (ECF No. 69, pp. 19-23).

Over defense counsel's objection, the court permitted Pinkston's friend Ann Rickey to testify.[55] Rickey stated that in May 1997 (about 2 years after Payne's killing) Pinkston's mother called Rickey and her husband because Pinkston was at the airport in Las Vegas and seemed to be distraught and disoriented. When Rickey and her husband found Pinkston at the airport, Pinkston said she had not slept much over the last week and that FBI and other law enforcement agencies were following her. Pinkston told Rickey that over the last two days she had been to Phoenix, driven south through Texas and had somehow ended up in Chicago. Rickey testified:

---

[55] Exh. 42, at 18-50.

She said she had been to Phoenix and gotten Kaitlyn and had been
traveling by car and by plane and had intended to leave to go to Canada
with Kaitlyn.  But at the last minute she decided she couldn't do that
because she would be constantly followed.

Exh. 42, pp. 32-33.

Pinkston also failed to raise this claim as a federal constitutional violation on direct

appeal.[56]  This court previously concluded that the claim is technically exhausted and

procedurally barred (*see* ECF No. 29, pp. 14-15; *see also* ECF No. 33).  Again,

Pinkston urges that she can demonstrate cause and prejudice based on ineffective

assistance of appellate counsel for failure to raise this claim as a federal constitutional

violation.  The Nevada Supreme Court expressly rejected the IAC claim in her state

postconviction proceedings:

Pinkston unsuccessfully argued in her direct appeal that the district
court erred by allowing the State to impeach her on rebuttal with testimony
from Ann Rickey that Pinkston planned to flee the country before trial.  On
direct appeal, we concluded that Pinkston's plan was relevant as
consciousness of guilt.  Pinkston now argues that appellate counsel
should have argued that this testimony violated her rights to due process,
the right to a fair trial, and the right to present a defense.  However,
Pinkston fails to explain how this court may have decided her direct
appeal differently had counsel argued violations of due process, the right
to a fair trial, and the right to present a defense.  Under the only relevant
case Pinkston cites, evidence admitted in violation of a state rule of
evidence only violates due process when there are "no permissible
inferences the jury may draw from the evidence" and the evidence is "'of
such quality as necessarily prevents a fair trial.'"  Pinkston fails to
articulate how this evidence prevented her from getting a fair trial.

Exh. 101, pp. 11-12.

Pinkston has not shown how the outcome of her appeal would have been different if

her counsel had presented this claim as a federal constitutional violation. As with

grounds 2 and 5, ground 6 is dismissed as procedurally barred from federal habeas

review.

Accordingly, the petition is denied in its entirety.

---

[56] *See* exh. 58, at 39-45.

**IV. Certificate of Appealability**

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating Pinkston's petition, the court finds that none of those rulings meets the *Slack* standard. The court therefore declines to issue a certificate of appealability for its resolution of Pinkston's petition.

**V. Conclusion**

**IT IS THEREFORE ORDERED** that the second-amended petition (ECF No. 69) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment and close this case.

DATED: 15 January 2020.

_____
KENT J. DAWSON
UNITED STATES DISTRICT JUDGE

37